**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

VINCENT HENDERSON; DARYELLE
REXRODE; JOHN CALELLA,
Plaintiffs-Appellants,

v.                                                              No. 99-1706

STUART O. SIMMS; RICHARD LANHAM,
SR.; WILLIAM O. FILBERT,
Defendants-Appellees.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Frederic N. Smalkin, District Judge.
(CA-99-949-S)

Argued: April 6, 2000

Decided: July 28, 2000

Before LUTTIG and WILLIAMS, Circuit Judges, and
Gerald Bruce LEE, United States District Judge for the
Eastern District of Virginia, sitting by designation.

_____

Affirmed by published opinion. Judge Williams wrote the opinion, in
which Judge Luttig and Judge Lee joined.

_____

**COUNSEL**

**ARGUED:** Douglas R.M. Nazarian, HOGAN & HARTSON, L.L.P.,
Baltimore, Maryland, for Appellants. Andrew Howard Baida, Assis-
tant Attorney General, Baltimore, Maryland, for Appellees. **ON**

**BRIEF:** Ralph S. Tyler, HOGAN & HARTSON, L.L.P., Baltimore, Maryland; Eugene J. Yannon, Bowie, Maryland, for Appellants. J. Joseph Curran, Jr., Attorney General of Maryland, Lawrence P. Fletcher-Hill, Assistant Attorney General, Baltimore, Maryland, for Appellees.

_____

## OPINION

WILLIAMS, Circuit Judge:

Appellants Vincent Henderson, Daryelle Rexrode, and John Calella filed a 42 U.S.C.A. § 1983 (West Supp. 1999) suit in the United States District Court for the District of Maryland against Appellees Stuart O. Simms, Richard A. Lanham, Sr., and William O. Filbert in their individual capacities. Appellants sought damages arising out of their summary arrests and reincarceration, pursuant to retake warrants for escapees, following their release from incarceration on mandatory supervision. The district court dismissed Appellants' suit on the ground of qualified immunity, reasoning that Appellees did not violate Appellants' clearly established constitutional rights under the Fourth or Fourteenth Amendment. We hold that Appellees' arrests of Appellants pursuant to retake warrants for escapees did not violate Appellants' Fourth Amendment rights. We further hold that Appellees did not violate Appellants' Fourteenth Amendment rights in failing to provide Appellants a hearing to challenge their arrests and reincarceration because Appellees reasonably thought that Appellants were mistakenly released prisoners with no cognizable interest in remaining at liberty. We therefore affirm the district court's dismissal of Appellants' complaint.

I.

Because this case is on appeal from a district court's order dismissing Appellants' complaint, we take the following facts as alleged in the complaint as true. See S.P. v. City of Takoma Park, 134 F.3d 260, 264 (4th Cir. 1998). Vincent Henderson, Daryelle Rexrode, and John Calella were convicted in Maryland state court of violating various provisions of the Maryland criminal law. All three served their

2

respective criminal sentences, less deductions for diminution credits earned, and were released from incarceration on"mandatory supervision," a release status similar to parole. Henderson was released on July 7, 1997. Rexrode was released on March 28, 1996. Calella was released on December 11, 1995. Each complied with the terms of his release from the time of his release through the filing of the instant complaint.

On March 9, 1998, the Court of Appeals of Maryland decided the case of Beshears v. Wickes, 706 A.2d 608 (Md. 1998). Wickes involved the interpretation of the Maryland statutes governing the calculation of sentence diminution credits. Sometime between March 9, 1998 and May 1, 1998, state officials Stuart O. Simms, Richard A. Lanham, Sr., and William O. Filbert[1] decided that their understanding of the rule in Wickes should be applied to recalculate the statutory diminution credits of persons, including Appellants, who had been released prior to the decision in Wickes. Simms and Lanham, acting under color of state law, ordered that the release dates of Henderson, Rexrode, and Calella be recalculated. As a result of these recalculations, Simms and Lanham authorized and established new release dates for Appellants that fell far into the future.

Appellees then decided to implement their interpretation of Wickes by arresting and reincarcerating previously released persons, such as Appellants, whose revised, post-Wickes release dates had not yet arrived. Acting pursuant to Md. Ann. Code art. 27,§ 682(d) (1996) (the Maryland retake-warrant statute),[2] Filbert executed and issued

_____

[1] At the time of the complaint, Simms was the Secretary of the Maryland Department of Public Safety and Correctional Services, Lanham was the Commissioner of the Maryland Division of Correction, and Filbert was the Warden of the Maryland Reception, Diagnostic and Classification Center.

[2] Section 682(d) provides as follows:

> (1) The warden or superintendent of each institution or a designee of the warden or superintendent may issue retake warrants for the apprehension and return of escapees.

> (2) A copy of the retake warrant shall be forwarded to the office of the State's Attorney for the county from which the escape was made.

warrants for the arrests of Henderson, Rexrode, and Calella. The warrants were each titled "Retake Warrant for Arrest and Detention of Escaped Prisoner," although Appellees had actual knowledge that none of Appellants had in fact escaped. In fact, the warrant specifically noted that it was being issued "as a result of a court decision requiring a recalculation of the offender's term of confinement" and would expire on the revised date recalculated for that prisoner. (J.A. at 19.) Appellees, acting under color of state law, ordered that Appellants be arrested pursuant to the § 682(d) warrants issued and signed by Filbert.

Pursuant to these § 682(d) warrants, Appellees directed and caused armed police officers to arrest each Appellant at his home or place of work on or about May 1, 1998, and then had each incarcerated. Appellees did not afford Appellants a hearing (either pre-arrest or post-arrest) to challenge the basis or legitimacy of their arrests or incarceration. Following his arrest, on May 8, 1998, Henderson filed a petition for writ of habeas corpus in the Circuit Court for Baltimore County. On May 14, the court granted the petition, denied Appellees' motion for a stay, and ordered Henderson released. On May 18, the Court of Appeals of Maryland granted Appellees' petition for certiorari review of the circuit court's order releasing Henderson and denied Appellees' motion for a stay. Appellees then released Rexrode and Calella from incarceration. Following briefing and argument, the Court of Appeals of Maryland affirmed the circuit court's grant of habeas relief to Henderson, on the ground that Appellees had misinterpreted the Court of Appeals's prior decision in Wickes. See Secretary, Dep't of Pub. Safety & Correctional Servs. v. Henderson, 718 A.2d 1150, 1157-58 (Md. 1998). As a result of Appellees' actions, Henderson was incarcerated from on or about May 1, 1998 to May

_____

> (3) Any sheriff or police officer authorized to serve criminal process, to whom a warrant for the retaking of an escapee shall be delivered, is authorized and required to execute such warrant in accordance with the directions contained therein. A sheriff or police officer making an arrest under this subsection shall promptly notify the Division of Correction of the arrest.

Md. Ann. Code art. 27, § 682(d) (1996).

4

14, 1998 and Rexrode and Calella were incarcerated from on or about May 1, 1998 to May 18, 1998.

On April 6, 1999, Appellants filed suit under 42 U.S.C.A. § 1983 (West Supp. 1999) in the United States District Court for the District of Maryland seeking damages as a result of their arrests and reincarceration. The complaint alleged that Appellees violated Appellants' clearly established rights under the Fourth and Fourteenth Amendments by arresting and reincarcerating Appellants without probable cause and without a hearing following Appellees' determination that Appellants had been prematurely released from incarceration on mandatory supervision. Appellees filed a motion to dismiss. By memorandum opinion and order dated May 14, 1999, the district court granted Appellees' motion to dismiss the complaint in its entirety on the ground that Appellees were entitled to qualified immunity. The district court reasoned that Appellees' actions did not violate Appellants' clearly established procedural due process rights under the Fourteenth Amendment because Appellees "reasonably could have believed that [Appellants] had no protected liberty interest that demanded predeprivation notice and a hearing" and did not violate Appellants' clearly established rights under the Fourth Amendment because Appellees "reasonably could have believed that escape from custody was the closest model for obtaining legal process to effect the retakes required by Maryland law, there being no statute of Maryland covering this unlikely situation." (J.A. at 117-18.) On May 19, 1999, Appellants filed a timely notice of appeal.

II.

Before us, Appellants make two arguments why the district court judgment should be reversed. First, Appellants argue that because Appellees knew that Appellants had not escaped, the retake warrants lacked probable cause and were invalid, and, therefore, Appellants' arrests violated their clearly established rights under the Fourth Amendment to be secure from unlawful arrest. Second, Appellants argue that because the Fourteenth Amendment has long required that a decision to revoke a former inmate's release status be accompanied by a corresponding opportunity to challenge the revocation, Appellees' denial of a hearing violated Appellants' clearly established rights under the Fourteenth Amendment. We review de novo a district

5

court's grant of a motion to dismiss on the ground of qualified immunity. See S.P. v. City of Takoma Park, 134 F.3d 260, 265 (4th Cir. 1998).

"Qualified immunity is an accommodation by the courts to the conflicting concerns of, on one hand, government officials seeking freedom from personal monetary liability and harassing litigation and, on the other hand, injured persons seeking redress for the abuse of official power." Hodge v. Jones, 31 F.3d 157, 162 (4th Cir. 1994) (internal quotation marks omitted). To that end, qualified immunity protects government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In determining whether a government official is entitled to qualified immunity, "we must (1) identify the right allegedly violated, (2) determine whether the constitutional right violated was clearly established at the time of the incident, and (3) evaluate whether a reasonable offic[ial] would have understood that the conduct at issue violated the clearly established right." S.P., 134 F.3d at 265. These steps are sequential; we "`must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all,'" before "`proceed[ing] to determine whether that right was clearly established at the time of the alleged violation.'" Wilson v. Layne, 119 S. Ct. 1692, 1697 (1999) (quoting Conn v. Gabbert, 119 S. Ct. 1292, 1295 (1999)). Accordingly, we address Appellants' claims in turn, focusing first on whether Appellants' complaint has alleged a deprivation of their constitutional rights.

A.

Appellants' complaint contends that their arrests by Appellees pursuant to "escapee" warrants violated the Fourth Amendment. The Fourth Amendment, applicable to the States through the Fourteenth Amendment, see Mapp v. Ohio, 367 U.S. 643, 654-55 (1961), states in pertinent part that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause," U.S. Const. amend. IV. Subject to limited exceptions not relevant in this

6

case,**3** the general rule is that "Fourth Amendment seizures are `reasonable' only if based on probable cause." <u>Dunaway v. New York</u>, 442 U.S. 200, 213 (1979). Probable cause, in turn, is "defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." <u>Gerstein v. Pugh</u>, 420 U.S. 103, 111 (1975) (internal quotation marks omitted). "Whether probable cause exists in a particular situation . . . always turns on two factors in combination: the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct." <u>Pritchett v. Alford</u>, 973 F.2d 307, 314 (4th Cir. 1992). "Probable cause therefore could be lacking in a given case, and an arrestee's right violated, either because of an arresting officer's insufficient factual knowledge, or legal misunderstanding, or both." <u>Id.</u>

In this case, it is undisputed that Appellants were "seized" within the meaning of the Fourth Amendment when arrested pursuant to retake warrants. <u>See Brower v. County of Inyo</u>, 489 U.S. 593, 597 (1989) (holding that Fourth Amendment seizure occurs "only when there is a governmental termination of freedom of movement <u>through means intentionally applied</u>"); <u>Dunaway</u>, 442 U.S. at 207 (holding that petitioner was "seized" when he was taken involuntarily to the police station). Appellants contend that because they had not escaped, but rather had been released on mandatory supervision, the plain language of the Maryland retake-warrant statute did not authorize Appellees to issue retake warrants for Appellants' arrests. Appellants assert that as a consequence, the retake warrants were supported by no cause, let alone legally sufficient probable cause.

In response, Appellees contend that under Maryland law and law from other jurisdictions, prisoners erroneously released from incarceration hold the same status as escapees for purposes of their reincarceration. In support of this proposition, Appellees cite <u>Hopkins v. North</u>, 135 A. 367 (Md. 1926). In <u>Hopkins</u>, an individual who was sentenced to jail became ill and was released for treatment at a sanato-

_____

**3** For example, in <u>Terry v. Ohio</u>, 392 U.S. 1, 20-27 (1968), the Supreme Court held that the police may make a brief, on-the-spot stop on the street and a frisk for weapons based upon a reasonable suspicion that criminal activity is afoot.

rium by the sheriff upon order of a magistrate. See id. at 367-68. After the prisoner completed his treatment but refused to return to jail, the state's attorney filed a petition for a mandamus to compel the sheriff to arrest the prisoner and keep him in jail until he had served the remainder of his sentence. See id. at 368. In addressing this issue, the Court of Appeals of Maryland first held that "[t]he decided weight of authority, and, in our opinion, the better reasoned cases, hold that, where a prisoner secures his liberty through some illegal or void order, it is to be treated as an escape, and he can be retaken and compelled to serve out his sentence." Id. After noting that the magistrate's order and the sheriff's action in releasing the prisoner in the first place were unauthorized and illegal, and that the prisoner was given his liberty upon the understanding that when he recovered from his illness he would return to jail and serve the unexpired portion of his sentence, the Court concluded that "under the circumstances of this case [the prisoner] must be treated as having escaped, and so is subject to arrest, and that upon his arrest he can be compelled to serve the remainder of his sentence." Id.

The Maryland Court of Appeals's decision in Hopkins supports Appellees' position that no violation of Appellants' Fourth Amendment rights occurred in this case. Because Appellants do not challenge Appellees' substantive decision to apply Wickes retroactively, but only challenge the means by which that decision was carried out, including, inter alia, the execution and issuance of retake warrants for Appellants' arrests, it follows that Appellants do not challenge the reasonableness of Appellees' belief that Appellants were released "through some illegal or void order." Appellants cite no subsequent Maryland case, and we could find none, suggesting that Maryland courts would depart from Hopkins. In light of this dearth of dispositive case law, we believe that the common-law definitions of "escape" and "escapee" in Hopkins are the best indication of how the terms "escape" and "escapees" in the Maryland retake-warrant statute would be construed today by a Maryland court. See Lorillard v. Pons, 434 U.S. 575, 583 (1978) ("[W]here words are employed in a statute which had at the time a well-known meaning at common law . . . they are presumed to have been used in that sense unless the context compels to the contrary." (alteration in original) (internal quotation marks omitted)). Accordingly, because Hopkins instructs us that a mistakenly released prisoner is to be treated under Maryland law as an escapee

8

for purposes of his reincarceration, we conclude that Appellees did not violate Appellants' Fourth Amendment rights to be free from unreasonable seizure when they arrested Appellants pursuant to retake warrants for escapees. Appellees, therefore, are entitled to dismissal of Appellants' Fourth Amendment claim. See Jenkins v. Medford, 119 F.3d 1156, 1160 (4th Cir. 1997) (en banc).

Even assuming arguendo that Appellees' arrest of Appellants violated Appellants' Fourth Amendment rights to be free from unreasonable seizure, we are convinced that these rights were not clearly established at the time of the seizures. This Court has held that the Fourth Amendment right to be arrested only on probable cause is clearly established. See Smith v. Reddy, 101 F.3d 351, 356 (4th Cir. 1996). If the test of clearly established law is applied at this level of generality, however, plaintiffs alleging a Fourth Amendment violation could "convert the rule of qualified immunity . .. into a rule of virtually unqualified liability." Anderson v. Creighton, 483 U.S. 635, 639 (1987); see also S.P., 134 F.3d at 266 (stating principle in mental health seizure context). Appellants must therefore allege facts "demonstrating that the established contours of probable cause were sufficiently clear at the time of the seizure such that the unlawfulness of [Appellees'] actions would have been apparent to reasonable offic[i-als]." Id. In other words, the appropriate question is whether a reasonable state official could have believed that issuing retake warrants pursuant to the Maryland retake-warrant statute for the arrests and reincarceration of individuals erroneously released on mandatory supervision was lawful, in light of clearly established law and the information Appellees possessed. Cf. Wilson, 119 S. Ct. at 1700.

Applying these principles to this case, it was clearly not unreasonable for a Maryland state official in May 1998 to have believed that executing and issuing retake warrants pursuant to§ 682(d) for the arrests and reincarceration of individuals they reasonably believed to have been erroneously released was lawful. First, because there is no provision in the Annotated Code of Maryland specifically providing for the retake of prisoners erroneously released, and given that Maryland's highest court had stated in Hopkins that prisoners who gained their liberty "through some illegal or void order" had the status of escapees, it was not unreasonable for Appellees to believe that the means provided for retaking escapees applied to retaking mistakenly

9

released prisoners as well. Second, Appellants cite no judicial opinions, and we can find none, stating that it is unlawful to use an escapee warrant to arrest and reincarcerate erroneously released prisoners. See id. (relying in part upon lack of judicial opinions on whether media entrances into a home violated Fourth Amendment to justify finding that the right to be free from such entrances was not clearly established). Although Appellants contend that Appellees could have obtained the warrants "the old-fashioned lawful way," we decline to impose liability on Appellees based upon their failure successfully to predict the course of the law. Accordingly, even if Appellants' Fourth Amendment rights in this particular context were cognizable, these rights were not sufficiently clear at the time of Appellants' arrests to notify reasonable state officials in Appellees' position that their conduct was unlawful, thus entitling Appellees to qualified immunity on Appellants' Fourth Amendment claim.

B.

Second, Appellants argue that their reincarceration without a hearing to challenge the basis for the reincarceration violated their rights not to be deprived of liberty without due process of law under the Fourteenth Amendment. The Fourteenth Amendment provides in relevant part that "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "We examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 460 (1989) (internal citation omitted). An individual claiming a liberty or property interest protected by the Fourteenth Amendment "must have a legitimate claim of entitlement to it." Id. "Protected liberty interests `may arise from two sources -- the Due Process Clause itself and the laws of the States.'" Id. (quoting Hewitt v. Helms, 459 U.S. 460, 466 (1983)).

In Morrissey v. Brewer, 408 U.S. 471 (1972), the Supreme Court addressed the question of whether the requirements of procedural due process applied to parole revocations. See id. at 481. In answering that question in the affirmative, the Court first noted that "the liberty of

10

a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a `grievous loss' on the parolee and often on others." Id. at 482. Buttressing the parolee's interest in liberty is the society's interest "in not having parole revoked because of erroneous information or because of an erroneous evaluation of the need to revoke parole" and its interest "in treating the parolee with basic fairness." Id. at 484. Accordingly, the Supreme Court held that due process required a preliminary hearing at the time of the parolee's arrest and detention "to determine whether there is probable cause or reasonable ground to believe that the arrested parolee has committed acts that would constitute a violation of parole conditions," id. at 485, and a revocation hearing prior to the final decision on revocation and within a reasonable time after the parolee is taken into custody in which the parolee has "an opportunity to be heard and to show, if he can, that he did not violate the[parole] conditions, or, if he did, that circumstances in mitigation suggest that the violation does not warrant revocation," id. at 488.

In Gagnon v. Scarpelli, 411 U.S. 778 (1973), the Supreme Court extended the two-hearings requirement set forth in Morrissey to the revocation of probation. See id. at 482. This Court subsequently extended Morrissey and Gagnon to require a hearing in the case of a pardon revocation. See Pope v. Chew, 521 F.2d 400, 404-05 (4th Cir. 1975). Finally, in United States v. Copley , 978 F.2d 829, 831 (4th Cir. 1992), this Court extended the due process protections enunciated in Morrissey and Gagnon to revocation of supervised release. In light of these precedents, Appellants argue, the lack of any hearing at all to challenge the basis of their arrests and reincarceration violated their rights to due process.

Appellants' argument overlooks one simple fact: by their own admission, their case "does not challenge [Appellees'] substantive decision to apply Wickes retroactively" but rather challenges "the lawfulness of [Appellees'] deliberate decision to carry out their retroactive decision of Wickes," by, inter alia, denying Appellants an opportunity to challenge Appellees' decision to have them arrested and incarcerated. (Appellants' Br. at 16.) Appellants therefore do not challenge the reasonableness of Appellees' misinterpretation of Wickes, and by implication, the reasonableness of Appellees' belief that Appellants had been mistakenly released. A prisoner who is mis-

11

takenly released does not have a protected liberty interest because, unlike a parolee, he does not have a "legitimate claim of entitlement" to freedom. See Campbell v. Williamson, 783 F. Supp. 1161, 1164 (C.D. Ill. 1992); see also McKellar v. Arizona State Dep't of Corrections, 566 P.2d 1337, 1339 (Ariz. 1977) (holding that state's seizure and reincarceration of mistakenly released prisoner without a hearing did not violate due process). With no liberty interest to protect, there is no violation of due process and no need for the pre-detention hearings contemplated by Morrissey and its progeny. Because Appellants' complaint failed to show that they suffered a deprivation of due process, Appellees are entitled to dismissal of Appellants' Fourteenth Amendment claim. See Jenkins, 119 F.3d at 1160.

Even assuming arguendo that a mistakenly released prisoner possesses a liberty interest and the due process right to challenge his arrest at a preliminary hearing and at a hearing just prior to reincarceration, Appellees would still be entitled to qualified immunity on Appellants' Fourteenth Amendment claim because this right was not clearly established at the time of Appellants' arrests. At the time of Appellants' arrests, this Court recognized that the due process requirements of Morrissey applied to revocations of pardons and revocations of supervised release. Because the liberty interest of a mistakenly released prisoner differs greatly from the liberty interest of a prisoner who has been pardoned or a prisoner who is on supervised release, it does not automatically follow that a mistakenly released prisoner is entitled to a hearing to challenge his arrest and reincarceration. See Copley, 978 F.2d at 831 ("Logic would extend this protection [enunciated in Morrissey and Gagnon] to hearings to revoke supervised release."); Pope, 521 F.2d at 404 ("The Commonwealth has not suggested, and we have been unable to imagine, how the liberty interests of one who is free on conditional pardon differ from one who is free on parole or probation."). Thus, Appellants' Fourteenth Amendment rights in this particular context, even if recognized, were not sufficiently clear at the time of their arrests to notify reasonable state officials in Appellees' position that their denial of a hearing to Appellants was unlawful.

III.

In sum, we hold that Appellees did not violate Appellants' rights under the Fourth Amendment and that Appellants had no protected

12

liberty interest under the Fourteenth Amendment. We therefore affirm the district court's dismissal of Appellants' complaint.

<u>AFFIRMED</u>

13