**Thomas S. MILLS, Plaintiff,**

v.

**Charles W. STEGER, et al., Defendant.**

**No. CIV.A. 7:01CV00225.**

United States District Court,
W.D. Virginia,
Roanoke Division.

Jan. 9, 2002.

Simon Delano Roberts Moore, Anthony Marc Russell, Gentry, Locke, Rakes & Moore, Roanoke, VA, for Thomas S. Mills.

Kay Kurtz Heidbreder, Virginia Polytechnic Institute & State University, Jerry D. Cain, Commonwealth of Virginia Special Assistant Attorney General, Blacksburg, VA, for defendants.

Sydney E. Rab, Office of the Attorney General, Richmond, VA, for Charles W. Steger, Larry Hincker, Raymond Smoot and Minnis Ridenour.

### MEMORANDUM OPINION

WILSON, Chief Judge.

In this action, Plaintiff, Thomas S. Mills ("Mills"), Station Manager of WVTF, a public radio station, sues Defendants, Charles W. Steger, Raymond Smoot, Minnis Ridenour, and Larry Hincker, all Virginia Tech administrators and Mills' supervisors, under 28 U.S.C. § 1983 and state law. Mills claims Defendants violated the Fourteenth Amendment by reassigning and firing him without due process of law, violated the First and Fourteenth Amendments by reassigning him and firing him in retaliation for his protected speech, and defamed him and violated the Fourteenth Amendment in statements one of the Defendants made to the media. The court finds that Mills' claims are without merit and that Defendants are entitled to qualified immunity. Accordingly, the court will grant Defendants' motion for summary judgment.

### I.

Mills was employed by Virginia Polytechnic Institute and State University ("Virginia Tech") as the Station Manager for WVTF, a public radio station, operated by the Virginia Tech Foundation. Under Mills' leadership WVTF grew from its roots as a small, struggling public radio station to an award winning, nearly self-sufficient radio station, ranked as the most listened to public radio station in similarly sized markets.

Mills' job responsibilities included making decisions regarding programming and handling public relations issues arising from these programming decisions. Traditionally, Mills' supervisors, administrators at Virginia Tech, stayed out of programming decisions and deferred to Mills' expertise. Programming decisions could be very controversial at WVTF, and listeners often criticized Mills for his decisions. In 1990, Mills received two death threats after he canceled a bluegrass show, and in 1995, he was severely criticized for pulling the program "Fresh Air" off the air. (Plaintiff's Exhibit 10.) Some listeners complained because they wanted more classical music, others wanted more bluegrass music, and still others wanted less music and more news programming. (Plaintiff's Exhibit 10.) Mills was quoted in the Roanoke Times as saying, "I am constantly fending off special interest groups who believe WVTF should devote air time to them. It is a long list, ranging from the American Guild of Organists to bluegrass music groups, gay and lesbian organizations, theater groups, you name it." (Plaintiff's Exhibit 11.)

None of these special interest groups fight harder for their cause than the fans of the Metropolitan Opera. Mills claims that the hard core fans of the Metropolitan

Opera are known nationwide for the "no-holds-barred tactics" they use "to get their way." (Plaintiff's Statement of Facts ¶ 54.) According to Mills, these opera fans fight to retain "the Opera on public radio stations irregardless [sic] of unrealistic restrictions placed upon public broadcasting stations by the Metropolitan Opera." (Plaintiff's Statement of Facts ¶ 54.) "Perhaps the most oft-told story is that of former Wisconsin Public Radio manager Jack Mitchell, whose decision to drop the Met so angered area opera lovers that they burned him in effigy." (Plaintiff's Exhibit 11.)

Public radio stations around the country had been canceling the Metropolitan Opera because of its low listenership and the low revenue it produced. (Plaintiff's Statement of Facts ¶ 30–34.) WVTF was no exception. Market research indicated that WVTF was losing substantial listenership to other public radio stations as the result of airing the Metropolitan Opera and that WVTF received low pledge results from Metropolitan Opera listeners. (Mills Aff. ¶ 14–15.) As a result, Mills argued that WVTF should move the Metropolitan Opera from its live airing on Saturday, a prime-time slot, to a tape-delayed airing on Sunday. The Metropolitan Opera, however, refused to allow WVTF, or other public radio stations, to air the opera on Sunday. (Plaintiff's Statement of Facts ¶ 30). The Metropolitan Opera's live-or-nothing policy forced Mills to cancel the Metropolitan Opera from WVTF's programming.

This programming decision created a "monstrous public relations flap." (Plaintiff's Statement of Facts ¶ 36.) Roanoke opera lovers mounted a vigorous defense of the Metropolitan Opera using unconventional tactics. Traditionally, critics of public radio programming would complain directly to the radio station. The Metropolitan Opera supporters, however, mounted an end-run in which they by-passed WVTF and its Station Manager and complained directly to Mills' supervisors at Virginia Tech. In his deposition, Mills stated that he was "very surprised by the tactics used by the local opera organization and opera listeners, specifically not even bothering to talk to the station about their displeasures about the opera being dropped but instead going directly to the university administration." (Mills Deposition at 81.) According to Virginia Tech administrators, the cancellation of the opera created a "firestorm" of protests by opera listeners. (Plaintiff's Statement of Facts ¶ 38; Exhibit 11.) As a result of the pressure, Virginia Tech administrators, specifically Larry Hincker, Raymond Smoot, Minnis Ridenour and Charles Steger, decided to intervene in the programming decisions at WVTF.

In December 1999, Hincker directed Mills to place the Metropolitan Opera back on the air. Mills "became quite upset, because Virginia Tech was getting involved in programming decisions at WVTF, contrary to WVTF's mission statement and statements to the public." (Plaintiff's Statement of Facts ¶ 39.) After failing to convince Hincker that Virginia Tech should stand up to pressure from the opera lovers, Mills reluctantly followed the directive to put the Metropolitan Opera back on the air.

On December 16, 1999, Mills drafted a letter to Hincker and distributed it to all of the WVTF staff. In the letter, Mills criticized what he viewed as interference from Virginia Tech administrators "with no expertise in broadcasting." (Plaintiff's Exhibit 13.) Mills wrote that Hincker's plan to temporarily reinstate the opera and then cancel it later would "make us all look like fools." Likewise, Hincker's plan to "educate" their listeners about the harsh live-or-nothing policy of the Opera was

unrealistic. "Surely you have recognized by now that you cannot reason with these listeners," wrote Mills. He stated that in his opinion "this is indeed a dark day in the history of WVTF" because by forcing WVTF to reinstate the Metropolitan Opera, Virginia Tech administrators "severely compromised" WVTF's ability to "better serve the vast majority of [its] listeners." Mills ended the letter by suggesting that if Virginia Tech administrators had "hung in there a few more days, had a nice Christmas break, enjoyed the Sugar Bowl,[1] and then returned to campus," the controversy over the opera would have been over. (Plaintiff's Exhibit 13.)

Mills' letter, which he distributed to all of WVTF's employees, "unexplainably" reached the media, and the media contacted Mills. (Plaintiff's Statement of Facts ¶ 44.) Mills then spoke out publicly on this issue. Mills spoke out, in his own words, "in an effort to prevent fraud from being practiced on the public." (Plaintiff's Statement of Facts ¶ 45.) Mills accused Virginia Tech of violating FCC regulations by unduly interfering with programming decisions. Mills was quoted in the Roanoke Times as saying "I think I speak for the staff when I say we do not know how to function... What decision-making authority do I have? I don't think I have any." (Plaintiff's Exhibit 17.) Mills participated in a public debate over the Metropolitan Opera by writing letters to the Editor of the Roanoke Times defending his decision to cancel the Opera. In an article in Current, a trade publication for public radio stations, Mills referred to the opera supporters as "opera Nazis." Mills was quoted as saying "I used to think 'opera Nazi' was harsh. Not anymore. If anything, it's a little tame." (Defendants' Statement of Facts ¶ 18.) In his deposition, Mills explained that he did not invent the term "opera Nazis" and that it was a "term of art" in the public broadcasting community which refers to the "no-holds-barred tactics used by the Metropolitan Opera." (Mills' Deposition at 80; Plaintiff's Statement of Facts ¶ 53, 54.)

On March 3, 2000, Hincker met with Mills and removed him as Station Manager of WVTF. (Plaintiff's Statement of Facts ¶ 57.) Hincker cited several reasons for this action including public relations and managerial ability. (Defendants' Statement of Facts ¶ 21.) Mills claims that Hincker, Smoot, Ridenour and Steger made the decision to remove him as Station Manager. (Plaintiff's Statement of Facts ¶ 57.) Mills also claims that Hincker told him on March 3 that he was fired from Virginia Tech. (Plaintiff's Statement of Facts ¶ 57.) However, Mills remained on the payroll.

On March 5, 2000, the Roanoke Times carried an article under the headline "WVTF fires opera-axing manager" with a second line "Steve Mills says the action is improper intrusion of the Virginia Tech Foundation into the station's operations." (Defendants' Statement of Facts ¶ 23; Plaintiff's Statement of Facts ¶ 60.) Hincker was quoted in the article as saying "I wouldn't call it a quick decision ... There's years and years of issues that led up to this ... There's no way in the world a man would be removed as station manager for a single incident." (Defendants' Statement of Facts ¶ 23.)

On March 30, 2000, Hincker wrote Mills a letter advising that he was revoking his termination and reassigning him from the WVTF radio station in Roanoke to WWVT–AM in Blacksburg. (Plaintiff's Statement of Facts ¶ 63.) Mills, however, thought that since Blacksburg was over 35 miles away from Roanoke the reassign-

---

1. As it turns out, that advice was problematic. Virginia Tech lost the Sugar Bowl.

ment was void under the Virginia Tech Faculty Handbook. (Plaintiff's Statement of Facts ¶ 64.) Thus, Mills refused to show up for work in Blacksburg.

Virginia Tech administrators, however, believed that Blacksburg was less than 35 miles away from Roanoke and, therefore, insisted that Mills show up for work. Virginia Tech warned Mills in writing that he risked job termination for not showing up for his reassignment. Virginia Tech also advised Mills that he could file a grievance challenging his reassignment, but that he could not refuse to work while pursing his grievance options. (Plaintiff's Exhibit 22.) Mills, however, still refused to show up for work.

On April 24, 2000, nearly a month after Virginia Tech reassigned Mills to Blacksburg, Mills initiated a grievance procedure regarding his reassignment. Also, on April 24, 2000, Hincker sent Mills a letter advising him that Virginia Tech had commenced dismissal proceedings against Mills for his failure to show up for his reassignment. (Plaintiff's Statement of Facts ¶ 67.) In the letter, Hincker required Mills to attend a meeting the next day, April 25, 2000, at 9:00 a.m. with Minnis Ridenour. (Plaintiff's Statement of Facts ¶ 67.) Since Mills did not receive the letter until 11:00 p.m. on April 24, Mills claims that he did not have enough time to prepare and go to the meeting. (Plaintiff's Statement of Facts ¶ 68.)

On April 25, 2000, after Mills did not show up for the meeting, Hincker sent Mills a letter advising him that he had three days to send a written response to the reasons for his termination. (Plaintiff Statement of Facts ¶ 69.) On April 26, 2000, Mills sent a written response to the reasons for his termination to Hincker. In his response, Mills stated, inter alia, that he did not show up for his reassignment because he considered it void under the Virginia Tech Faculty Handbook. (Plaintiff's Exhibit 26.)

On May 2, 2000, Virginia Tech terminated Mills' employment. Hincker sent a letter to Mills the same day advising him of his termination. (Plaintiff's Exhibit 27.) In the letter, Hincker stated that he reviewed with Ridenour the reasons for the dismissal and that Hincker and Ridenour received and reviewed Mills' response of April 26. (Plaintiff's Exhibit 27.) However, Hincker testified in his deposition that Mills' response did not play a factor in his decision to terminate Mills and that he did not read Mills' response until after he had made up his mind to fire Mills. (Plaintiff Statement of Fact ¶ 72, 73.)

After his termination, Mills initiated grievance procedures under the Virginia Tech Faculty Handbook, and Virginia Tech provided Mills with a multi-step administrative review of the decision to terminate him. First, Hincker, who participated in the original decision to terminate Mills, reviewed the decision. Second, Raymond Smoot, who, according to Mills, also participated in the decision to terminate him, reviewed the decision. Third, a three-member panel picked from the Virginia Tech faculty reviewed the decision. The hearing panel was to make findings and recommendations which were to be reviewed by Minnis Ridenour. Mills claims that this panel unanimously concluded that his reassignment was void; however, Minnis Ridenour disregarded the panel's findings and recommendations and refused to hold that the reassignment was void under the Faculty Handbook. Mills complains that Ridenour also was involved in the initial decision to terminate him. Finally, President Charles Steger was to review Ridenour's decision. Steger, however, recused himself because of his connection with Mills' reassignment to Blacksburg. Steger appointed Interim Provost Dr.

James Bohland to hear the final stage of Mills' grievance procedure. Bohland, the final decision-maker, denied Mills' grievances and upheld the decision to terminate him. (Plaintiff's Statement of Facts ¶ 76.) Mills also complains that some of the decision-makers had ex parte communications regarding the merits of Mills' grievance.

## II.

Qualified immunity protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). This doctrine protects government officials from money damages unless they are "plainly incompetent" or they "knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 342, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). Here, Mills is not seeking reinstatement; he is only seeking money damages. Therefore, if the court finds that Defendants are entitled to qualified immunity, then the court should grant Defendants' motion for summary judgment.

In determining whether a government official is entitled to qualified immunity, the court must "(1) identify the right allegedly violated, (2) determine whether the constitutional right violated was clearly established at the time of the incident, and (3) evaluate whether a reasonable offic[ial] would have understood that the conduct at issue violated the clearly established right." *Henderson v. Simms*, 223 F.3d 267, 271 (4th Cir.2000) (quotations omitted). These steps are sequential. The court must first determine whether the plaintiff has alleged a constitutional violation before proceeding to determine whether the right was clearly established

or whether a reasonable official would have understood that he was violating the clearly established right. *See id.* Therefore, the court will address the substance of each of Mills' claims.

### A. Due Process–Property Interest

The Fourteenth Amendment prohibits a State from depriving "any person of life, liberty, or property, without due process of law." U.S. Const, amend. XIV, § 1. Mills claims that the Defendants deprived him of his property without due process of law by (1) terminating him on March 3, 2000, even though this termination was rescinded on March 30, 2000 and he did not lose pay or benefits, (2) reassigning him to Blacksburg in violation of the Virginia Tech Faculty Handbook, and (3) terminating him on May 2, 2000 after he did not show up for work.

First, the court finds that Defendants did not deprive Mills of a protected property interest when they fired him on March 3, 2000 because they later reinstated him and he did not lose any pay or benefits. An employer does not deprive an employee of a protected property interest when it suspends its employee with pay. *See Hicks v. City of Watonga*, 942 F.2d 737, 746 (10th Cir.1991); *Mosely v. Northern Virginia Community College*, 129 F.3d 1259, 1997 WL 716431 at *2 (4th Cir. November 18, 1997) (unpublished). Although Mills claims that Virginia Tech fired him on March 3, 2000, he continued to receive his full pay and benefits. This technical job termination was practically indistinguishable from a suspension with pay. Additionally, on March 30, 2000, Hincker rescinded Mills' termination. When an employer terminates an employee and then rescinds the termination before the employee suffers any loss in pay or benefits, the employer has not deprived the employee of a protected property interest. *See Heinen v. Brewer*, 171 F.3d

612, 614 (8th Cir.1999); *Otero v. Housing Authority,* 140 F.Supp.2d 157, 166 (D.Conn.2001); *see also Larson v. City of Fergus Falls,* 229 F.3d 692, 697 (8th Cir. 2000) (holding that due process "does not have to precede the termination decision, but only must precede the termination of benefits."). To hold otherwise would discourage employers from rethinking their decisions and correcting their mistakes. Due process' salutatory purposes are satisfied when an employer rescinds a termination decision before the employee loses any pay or benefits. Therefore, Defendants did not deprive Mills of a protected property interest when they terminated him on March 3, 2000 because they rescinded the termination before Mills lost any pay or benefits.

■ The court also concludes that Defendants did not deprive Mills of a protected property interest when they reassigned him to Blacksburg on March 30, 2000. Although Mills' reassignment may have been improper under the Virginia Tech Faculty Handbook, there is a distinction between contractual employment benefits and constitutionally protected property interests. While Mills might have had a protected property interest in *a* job at Virginia Tech, he did not have a protected property interest in his particular assignment as Station Manager at WVTF. *See Huang v. Board of Governors,* 902 F.2d 1134, 1142 (4th Cir.1990); *Parrett v. City of Connersville,* 737 F.2d 690, 693 (7th Cir.1984). To hold otherwise would trivialize the Constitution and turn routine, day-to-day disputes between state employers and their employees into federal cases. Since Mills did not have a protected property interest in a particular job assignment, his reassignment did not violate the Fourteenth Amendment.

■ Although Mills did not have a protected property interest in his job assignment, the court will assume, without deciding, that Mills had a protected property interest in *a* job with Virginia Tech. Therefore, the court will consider whether his termination on May 2, 2000 complied with due process. Mills argues that under *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), Defendants were required to provide him with notice of the charges against him, a pre-termination opportunity to respond to those charges, and post-termination administrative procedures. Viewing the facts in the light most favorable to Mills, the court finds that Defendants gave Mills these procedural protections.

In *Loudermill,* the Supreme Court explained that the purpose of the pre-termination proceeding is to provide "an initial check against mistaken decision-essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Loudermill,* 470 U.S. at 545–46, 105 S.Ct. 1487.

> The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee.

*Id.* at 546, 105 S.Ct. 1487 (citations omitted).

Here, Defendants gave Mills notice of the reasons for his discharge. Defendants warned Mills that he was considered "AWOL" and that he risked termination if he did not show up for work. Furthermore, on April 24, 2000, Hincker sent Mills a letter stating that dismissal proceedings

were being initiated against him because of his failure to report for work.

Defendants gave Mills several opportunities to respond to the reasons for his termination. First, there were many opportunities between March 30, when Virginia Tech reassigned him, and May 2, when Virginia Tech eventually terminated him, when Mills could have presented his side of the story. All that he had to do was show up for work and discuss his reassignment with his supervisors. It is incongruous for Mills to complain that he did not have the opportunity to explain himself to his supervisors when, in April of 2000, Mills refused to show up for work and even talk to his supervisors. Also, Mills' attorneys communicated regularly with Virginia Tech officials. On several occasions, Mills' attorneys contacted Virginia Tech officials and argued that Mills' reassignment was void under the Faculty Handbook because Blacksburg was over 35 miles from Roanoke.

Furthermore, when Hincker informed Mills on April 24 that termination proceedings were to begin, Hincker specifically gave Mills a chance to explain himself in a meeting with Virginia Tech administrators the next day. Once again, Mills did not show up. "An employee cannot be permitted to hang on to his job just by refusing to show up at a pre-termination hearing." *Scaife v. Racine County,* 238 F.3d 906, 908 (7th Cir.2001). Mills was then given an additional three days to explain himself in writing, and Mills, in fact, sent a letter to Virginia Tech officials explaining why he did not show up for work.

Mills argues that this last opportunity to respond in writing was a sham or subterfuge because Hincker admitted that Mills' letter played no part in his decision to terminate Mills. However, Mills' opportunity to respond was not a sham simply because Hincker had made the tentative decision to fire Mills before reading his latest response. Indeed, it would be surprising if Hincker initiated termination proceedings against Mills absent a belief that he should be fired. *See Ryan v. Illinois Department of Children and Family Services,* 185 F.3d 751, 762 (7th Cir. 1999).

In short, Mills received notice and a meaningful opportunity to be heard before he was terminated. The Fourteenth Amendment does not require any more elaborate or hyper-technical procedures before firing an employee who refuses to report for work.

■ Likewise, the court finds that Mills' post-termination procedures also complied with due process. Mills complains that Hincker, Smoot and Ridenour were biased because they were involved in the initial decision to reassign or terminate him. First, the court is not convinced that knowledge of the underlying dispute automatically disqualifies these individuals from participating in the post-termination review procedures. *See Gray v. Laws,* 51 F.3d 426, 439 n. 8 (4th Cir.1995) (noting that there is a "presumption that government officials can and will decide particular controversies conscientiously and fairly despite earlier involvement in their investigation."). Furthermore, other decision-makers in this process were impartial. The three-member panel was impartial, and, most notably, the final decision-maker, James Bohland, was impartial.

■ Mills also complains that some of the decision-makers had ex parte communications regarding the merits of Mills' grievance. Not every ex parte communication, however, is a "procedural defect so substantial and so likely to cause prejudice that it undermines the due process guarantee." *Stone v. Federal Deposit Insurance Corp.,* 179 F.3d 1368, 1376–78 (Fed.Cir.

1999). The issue is "whether the ex parte communication is so substantial and so likely to cause prejudice that no employee can fairly be required to be subjected to a deprivation of property under such circumstances." *Id.* at 1378. The ex parte documents Mills complains of are newspaper articles regarding Mills and WVTF, legal documents concerning an unrelated lawsuit involving Mills, and a letter suggesting that Mills was considering suing Virginia Tech for breach of contract. The court does not find that these communications would so prejudice the decision-makers that they could not impartially decide whether the decision to fire Mills for missing work was proper.

■ In summary, assuming that Mills has a protected property interest in a job at Virginia Tech, the court finds that Defendants gave Mills notice of his termination, an opportunity to be heard and post-termination administrative proceedings sufficient to satisfy due process of law. Furthermore, even assuming that Defendants somehow deprived Mills of property without due process of law, the court finds that Defendants are entitled to qualified immunity. As described above, "qualified immunity exists to protect [state officials] who reasonably believe that their actions do not violate federal law." *Doe v. Broderick,* 225 F.3d 440, 453 (4th Cir. 2000). Even if Mills' pre-termination and post-termination proceedings violated his due process rights, it was reasonable for Defendants to believe that the procedures they provided Mills complied with the Fourteenth Amendment; therefore, Defendants are entitled to qualified immunity.

## B. First Amendment

■ Mills also claims that Defendants violated his First Amendment[2] rights when they reassigned and fired him in retaliation for his speech. To determine whether Mills has established a claim under the First Amendment for retaliatory discharge, the court must determine: (1) whether Mills spoke out on a matter of public concern; (2) whether Mills' interest in speaking on the matter of public concern was outweighed by the interest of the State, as an employer, in the effective and efficient operation of its public services; (3) whether the alleged retaliatory action deprived Mills of some valuable benefit; and (4) whether there was a causal relationship between the expression of public concern and the retaliatory action. *See Connick v. Myers,* 461 U.S. 138, 146–153, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *McVey v. Stacy,* 157 F.3d 271, 277–78 (4th Cir.1998); *Huang v. Board of Governors of the University of North Carolina,* 902 F.2d 1134, 1140 (4th Cir.1990).

Skipping to the third element, the court notes that although the transfer to another station did not deprive Mills of a constitutionally protected property interest under the Fourteenth Amendment, the inquiry does not stop there. "[P]ossession of a property right is immaterial to a plaintiff's claim that he was deprived of some valuable benefit as a result of exercising his First Amendment rights." *Huang,* 902 F.2d at 1140. Therefore, the court must consider whether Defendants violated Mills' First Amendment rights by reassigning him to Blacksburg in retaliation for his speech.

First, the court must ask whether Mills' statement addressed a matter of public

---

**2.** The First Amendment has been "incorporated" into the Fourteenth Amendment and thereby made applicable against the states. *Stromberg v. California,* 283 U.S. 359, 368, 51 S.Ct. 532, 75 L.Ed. 1117 (1931); *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

concern. "[A] public employee's expression of grievances concerning his own employment is not a matter of public concern." *Huang*, 902 F.2d at 1140. In *Connick v. Myers*, the Supreme Court stated:

> To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark-and certainly every criticism directed at a public official-would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.

*Connick*, 461 U.S. at 149, 103 S.Ct. 1684.

Here, it is clear that Mills was venting personal frustration by publicly airing his private grievances with his supervisors. However, although there is considerable doubt that Mills' statements relate to a matter of public concern, the court will assume, without deciding, that they did. Nonetheless, the court still must balance Mills' interest in making his statements against "the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *see also Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

In balancing these interests, the court should consider the manner, time, place and context of the employee's expression. *Rankin*, 483 U.S. at 388, 107 S.Ct. 2891. The court should also consider the public's interest in the employee's speech. Under this balancing test, the plaintiff's individual interests "merge in a real sense with those of the community at large." *McVey*, 157

F.3d at 279 (Murnaghan, J., concurring). "A stronger showing of public interest in the speech requires a concomitantly stronger showing of government-employer interest to overcome it." *Id.* (Murnaghan, J., concurring).

The State interest element focuses on the effective functioning of the public employer's enterprise.

> Factors relevant to this inquiry include whether the employee's speech (1) impairs discipline by superiors; (2) impairs harmony among co-workers; (3) has a detrimental impact on close working relationships; (4) impedes the performance of the public employee's duties; (5) interferes with the operation of the agency; (6) undermines the mission of the agency; (7) is communicated to the public or to co-workers in private; (8) conflicts with the responsibilities of the employee within the agency; and (9) makes use of the authority and public accountability the employee's role entails.

*McVey*, 157 F.3d at 278 (quotations omitted). Additionally, when "employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office." *Connick*, 461 U.S. at 153, 103 S.Ct. 1684.

Here, Mills publicly stated that WVTF "[did] not know how to function," that Virginia Tech administrators, "with no experience in broadcasting," interfered in his decision, that Virginia Tech's plan would "make us all look like fools," and that "this is indeed a dark day in the history of WVTF." This insubordinate speech certainly had a detrimental impact on the close working relationship between Mills and his supervisors, threatened workplace

discipline and interfered with the operation of WVTF. "[A] government employer, no less than a private employer, is entitled to insist upon the legitimate day-to-day decisions of the office without fear of reprisals in the form of lawsuits from disgruntled subordinates who believe that they know better than their supervisors how to manage office affairs." *Boring v. Buncombe County Board of Education,* 136 F.3d 364, 369 (4th Cir.1998).

Furthermore, Mills publicly attacked listeners of WVTF who supported the Metropolitan Opera by referring to them as "opera Nazis," and claiming that "you could not reason with these listeners." The success of a public radio station depends upon the charity of its listeners-even the so-called "opera Nazis." By attacking and alienating a group of listeners, Mills compromised WVTF's ability to operate.

When weighing a public agency's interest in disciplining an employee based on a claim that his speech undermines the mission of the agency, "some attention must be paid to the responsibilities of the employee within the agency." *Rankin,* 483 U.S. at 390–91, 107 S.Ct. 2891. Where an employee serves in a sensitive capacity that requires extensive public contact, the employee's speech may pose a substantial danger to the successful operation of the employer's business. *See McVey,* 157 F.3d at 278–79; *Sims v. Metropolitan Dade County,* 972 F.2d 1230, 1237–38 (11th Cir. 1992). As Station Manager, Mills was in a position of authority that involved policy-making and public contact. When the controversy over the Metropolitan Opera arose, Mills instigated more negative public attention by attacking the so-called "opera Nazis" and criticizing his supervisors for not standing up to them. An employee like Mills, whose job involves public contact, cannot mishandle his public relations duties by creating controversies, challeng-

ing his superiors and insulting listeners, and then claim protection under the First Amendment.

Mills claims that Defendants have not produced enough evidence that his speech actually created a disturbance. However, it is not necessary "for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick* 461 U.S. at 152, 103 S.Ct. 1684. Mills' public statements certainly had the potential to create a public relations problem for WVTF and destroy the working relationships between Mills and his supervisors. Thus, WVTF did not have to wait before taking action.

Viewing the facts in the light most favorable to Mills, the court finds that Mills' interest in speaking out on the programming decisions at WVTF is outweighed by Virginia Tech's interest, as an employer, in promoting the efficiency of the public services it performs through its employees. Therefore, the First Amendment did not prevent Virginia Tech from reassigning or firing Mills in retaliation for his speech.

■ Moreover, even if Mills' speech was protected by the First Amendment, the court finds that Defendants were entitled to qualified immunity. Qualified immunity ensures that officials are not liable for "bad guesses in gray areas" and that they are only liable for "transgressing bright lines." *McVey,* 157 F.3d at 276. "Thus, particularly in First Amendment cases, where a sophisticated balancing of the interests is required to determine whether the plaintiff's constitutional rights have been violated, 'only infrequently will it be "clearly established" that a public employee's speech on a matter of public concern is constitutionally protected.'" *Id.* (quoting *DiMeglio v. Haines,* 45 F.3d 790, 806 (4th Cir.1995)); *see also Bartlett v. Fisher,*

972 F.2d 911, 916–17 (8th Cir.1992) (noting that qualified immunity should rarely be denied under *Pickering* which requires a balancing to resolve a public employee's First Amendment claim). Here, the court finds that Mills' First Amendment right to publicly attack his superiors and question their leadership, if it exists at all, was not so "clearly established" that a reasonable official would have known of the right. Therefore, Defendants are entitled to qualified immunity.

### C. Due Process–Liberty Interest

 On March 5, 2000, the Roanoke Times carried an article under the headline "WVTF fires opera-axing manager" with the by-line "Steve Mills says the action is an improper intrusion of the Virginia Tech Foundation into the station's operations." The article also contained Hincker's response: "I wouldn't call it a quick decision. There's years and years of issues that led up to this ... There's no way in the world a man would be removed as station manager for a single incident." Mills claims that Hincker's statement violated his constitutionally protected liberty interest.

A false public statement in the course of a discharge or demotion can implicate a constitutionally protected liberty interest if it implies " 'the existence of serious character defects such as dishonesty or immorality,' 'that might seriously damage [the plaintiff's] standing and associations in his community' or 'foreclose[ ] his freedom to take advantage of other employment opportunities.' " *Zepp v. Rehrmann*, 79 F.3d 381, 388 (4th Cir.1996) (quoting *Robertson v. Rogers*, 679 F.2d 1090, 1092 (4th Cir. 1982), and *Board of Regents v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). The court, however, finds that Hincker's statement did not imply serious character defects so as to seriously foreclose Mills' employment opportunities. The court also notes that Mills created the controversy over his reassignment by publicly attacking Virginia Tech officials. Hincker's statement was simply a response to Mills' accusations. Furthermore, even if Hincker deprived Mills of a protected liberty interest, the interest was not so clearly established that Hincker would reasonably have known that he was violating Mills' constitutional rights. Therefore, Hincker is entitled to qualified immunity.

### D. Defamation

Finally, Mills asserts a defamation claim against Hincker. However, the court finds that Hincker's statement was not defamatory, was essentially true, and was qualifiedly privileged. Accordingly, Mills' defamation claim fails as a matter of law.

### III.

For the reasons stated above, the court grants Defendants' motion for summary judgment. An appropriate order will be entered this day.