# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 9, 2016                    Decided July 28, 2017

No. 15-7153

MICHAEL D. HURD, JR.,
APPELLANT

v.

DISTRICT OF COLUMBIA, GOVERNMENT,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-00666)

———

*Eric C. Rowe* argued the cause for appellant. With him on the briefs was *C. Allen Foster*.

*Mary L. Wilson*, Senior Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellee. With her on the brief were *Karl A. Racine*, Attorney General, *Todd S. Kim*, Solicitor General, and *Loren L. AliKhan*, Deputy Solicitor General.

Before: PILLARD, *Circuit Judge*, and EDWARDS and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

Dissenting opinion filed by *Senior Circuit Judge* RANDOLPH.

PILLARD, *Circuit Judge*: In 2007, the Federal Bureau of Prisons released Michael Hurd from prison after he had served roughly 13 months of a 42-month sentence. If that release were mistaken and quickly recognized as such, a prompt arrest and re-incarceration would seem unproblematic. But the Bureau of Prisons discharged Hurd under circumstances that he reasonably believed reflected a deliberate sentence reduction. Indeed, Hurd remained in the District of Columbia and for three years submitted to supervision by the U.S. Parole Commission and the Court Services and Offender Supervision Agency (CSOSA) for the District of Columbia before the Parole Commission recommended his release from federal custody. Federal authorities discharged Hurd from supervised release in March of 2010. In 2011, Hurd pleaded guilty to marijuana possession in D.C. Superior Court and was sentenced to three consecutive weekends in the D.C. jail. After his second weekend duly serving this sentence, the D.C. Department of Corrections—without explanation or opportunity to be heard—disregarded the Superior Court order specifying that Hurd was "to be released on Sunday, October 2, 2011, at 7 p.m." and instead kept him imprisoned for an additional 27 months, apparently the remainder of his original sentence. Thus, more than four years after his release from federal prison, Hurd's weekend stint for marijuana possession stretched into two years in jail.

On November 16, 2011, Hurd filed a habeas petition against the United States in the D.C. Superior Court challenging his confinement as a violation of procedural and substantive due process. The court denied his petition from the bench in July 2012. Hurd appealed that decision to the D.C. Court of Appeals, but the court failed to act for another year

and a half. By that point, Hurd had served the balance of his initial sentence and been released. The Court of Appeals dismissed his appeal as moot.

Hurd then filed in federal district court this damages action against the District of Columbia under 42 U.S.C. § 1983, again pursuing both procedural and substantive due process claims. The district court dismissed his substantive due process claim as precluded by the D.C. Superior Court's 2012 decision denying his habeas petition against the United States, and dismissed both claims under Federal Rule of Civil Procedure 12(b)(6). *See Hurd v. D.C.*, 146 F. Supp. 3d 57 (D.D.C. 2015).

We conclude that the Superior Court's 2012 decision lacks the preclusive effect the district court perceived. Because Hurd was unable to obtain a decision on his habeas appeal once he was no longer in custody, and because section 1983 claims cannot be joined in a habeas proceeding, the Superior Court's unreviewed bench ruling was not the result of a full and fair opportunity to litigate.

On the merits, Hurd's complaint states a legally actionable procedural due process claim. His liberty interest sufficed to require that he be afforded some kind of process before he was locked up again. As for Hurd's substantive due process claim, the district court erred in dismissing that claim based on material beyond the complaint, and not incorporated by reference in it, without converting the motion to dismiss into one for summary judgment as contemplated by Federal Rules of Civil Procedure 12(d) and 56. We accordingly remand the case to the district court for further proceedings.

## I. Background

On appeal from an order granting a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure

12(b)(6), the relevant facts are those alleged in the complaint, taken in the light most favorable to the plaintiff and with all reasonable inferences drawn in his favor. Accordingly, except as otherwise noted, this factual background is based on the complaint.

Hurd was an active duty Marine from 1997 to 2001, and a Marine Corps reservist from 2001 to 2005. In 2006, after he pleaded guilty to possessing cocaine and an unregistered firearm in violation of D.C. law, the D.C. Superior Court sentenced Hurd to 42 months' imprisonment with a three-year term of supervised release. Hurd began serving his sentence at a federal prison in West Virginia on September 21, 2006. If Hurd had served the entirety of that term, he would have been released from prison in March of 2010.

The federal prison released Hurd in June 2007 without explanation. "At the time of his release, he apparently believed that his motion for a sentence reduction had been successful." *Hurd*, 146 F. Supp. 3d at 59-60. Hurd then served his three-year term of supervised release. During that period, as the District acknowledges, Hurd remained in the District of Columbia and regularly submitted to monitoring and drug tests. Hurd failed several drug tests and he was arrested three times but never convicted. Def.'s Mot. Dismiss Ex. 5, at 2, 27. Despite those violations of the terms of supervised release, the Parole Commission decided that letters of reprimand sufficed, *id.* at 29, 37-39, and the court did not revoke Hurd's supervised release. The three-year period after Hurd's June 2007 discharge from prison—years that all parties then believed constituted his post-imprisonment term of supervision— expired on July 18, 2010. By that time, the conduct of the federal prison that released him, the halfway house where he lived during his first few weeks out of prison, the Parole Commission, and the Court Services and Offender Supervision

Agency that regularly monitored him all reinforced Hurd's belief that he had been deliberately released from prison and had fully served his 2006 sentence.

Hurd pleaded guilty to possession of marijuana almost a year later, in September 2011, when possession of less than two ounces of marijuana was still a crime under D.C. law. *Compare* D.C. Code Ann. § 48-904.01(d)(1) (2010) (making marijuana possession a misdemeanor punishable by up to 180 days in jail), *with* D.C. Code Ann. § 48-904.01(a)(1)(A) (2015) (legalizing possession of two ounces or less). The Superior Court allowed Hurd, who had stable employment at the time, to serve his nine-day sentence in a local jail over the course of three weekends. He reported to D.C. jail on a Friday night and was released two days later. He returned the following weekend. But on Sunday, October 2, 2011, the D.C. Department of Corrections refused to release him. Prison personnel informed Hurd more than 50 months after his release from prison that he had 27 months of imprisonment still to serve on his 2006 sentence.[1] He was not given any prior notice or opportunity for a hearing to contest his re-incarceration. Without any assertion by federal authorities of an interest in taking Hurd back into federal custody, the D.C. Department of Corrections continued to hold Hurd for almost two years.

Hurd spent the ensuing years challenging his imprisonment. In November 2011, a few weeks after the District re-imprisoned him, Hurd petitioned the D.C. Superior Court on substantive and procedural due process grounds for habeas corpus relief against the United States (on behalf of

---

[1] It is unclear why Hurd would have 27 months left on his 2006 sentence if he served only 13 months of a 42-month sentence. The simple math would suggest he had 29 months remaining. The District assures us, however, that the underlying sentence calculation is not at issue in this dispute. Appellee Br. 7 n.1.

which the District appeared to be holding him). The Superior Court sought and timely received responses from the United States and the District of Columbia, but Hurd's petition then languished. After almost seven more months, Hurd filed a second petition requesting emergency relief.

The Superior Court held argument on the petition in July 2012. Hurd's attorney attempted to put into evidence certain D.C. Department of Corrections documents that, she claimed, falsely stated that the Superior Court re-sentenced Hurd on October 2 and gave him a hearing on October 3, 2011, *i.e.*, when it kept him incarcerated at the end of the second weekend of his marijuana sentence. Hurd's counsel proffered the documents as a fabrication, and evidence of the District's groundless, *post hoc* effort to paper over its error. *See* Suppl. App. 39 (defense counsel arguing that "the jail then went back into the record and made up that he had had another hearing on October 3rd, 2011, which never occurred, and that he was sentenced on October 2nd, 2011, which is not a date that . . . appears anywhere on Mr. Hurd's records"), *id.* at 54 (Court asking the District to respond to proffered documents and to "the argument . . . that the Department of Corrections overstepped its bounds and did that which is the exclusive purview of the Court"). When the prosecutor argued that the documents were unauthenticated, *id.* at 56, Hurd's attorney requested an opportunity to authenticate them at an evidentiary hearing, *id.* at 59. The Superior Court denied the request, expressing its desire to conclude the matter that day. *Id.*; *see id*. at 72 (stating that there was "no foundation" for the documents and "no witness here to address" them, but that "the Court is not going to delay this ruling in order to bring [witnesses] into court"). At the close of the argument, the court denied Hurd's habeas petition from the bench. *See id.* at 65-80.

Hurd appealed, but the D.C. Court of Appeals did not act for 17 months. Hurd's appeal remained unresolved even after he was released on September 30, 2013.[2] Hurd argued that he retained a live interest in that appeal because a successful habeas petition was a prerequisite to a civil claim challenging his re-incarceration. *Hurd v. United States*, No. 12-CO-1364, slip op. at 2 (D.C. Dec. 18, 2013) (available at Joint App. 128). The Court of Appeals rejected that argument and dismissed Hurd's appeal as moot. *Id.* The Court of Appeals cited passages of the Supreme Court's decision in *Spencer v. Kemna*, 523 U.S. 1, 17 (1998), and Justice Souter's concurring opinion, *id.* at 20-21, both of which concluded that a person released from prison before a ruling on his habeas petition would not necessarily be foreclosed from pursuing a section 1983 claim.

Hurd then filed this suit in the district court against the District of Columbia under 42 U.S.C. § 1983, seeking damages for a period of re-incarceration that he claimed violated both procedural and substantive due process. The District moved to dismiss, first on the ground that the Superior Court's denial of Hurd's habeas petition was *res judicata*. The District argued that the Superior Court had rejected the same constitutional claims "on the merits" and that that decision was entitled to full faith and credit, and thus preclusive of Hurd's damages claim. Alternatively, the District contended that Hurd's complaint failed plausibly to allege a violation of procedural or substantive due process. In support of its motion, the District attached as exhibits its brief and some of the accompanying

---

[2] Here too, the numbers do not add up. The Department of Corrections re-incarcerated Hurd on October 2, 2011. The Department told him he had 27 months remaining on his sentence, but released him on September 30, 2013—just shy of 24 months later. Nothing in the record explains that discrepancy.

sentencing and supervision documents that it had filed before the Superior Court in opposition to Hurd's habeas petition.

The district court dismissed Hurd's substantive due process claim as precluded and rejected both the substantive and procedural due process claims for failure to state a claim. First, the district court determined that "the Superior Court resolved the merits of [Hurd's] substantive due process claim," precluding Hurd's parallel section 1983 claim. *Hurd*, 146 F. Supp. 3d at 63. Proceeding to the merits, the district court, following the parties' lead, considered Hurd's substantive due process claim with reference to *United States v. Merritt*, 478 F. Supp. 804 (D.D.C. 1979). The district court gleaned from *Merritt* and other cases four factors that help determine "whether re-incarceration is so unfair as to implicate [substantive] due process concerns." *Id.* at 66. These factors were "(1) the length of mistaken release; (2) the government's level of culpability; (3) the prisoner's knowledge of, or contribution to, the mistake; and (4) the prejudice caused by re-incarceration, *i.e.*, how well the prisoner has readjusted to society." *Id.* The district court found re-incarceration non-prejudicial to Hurd on the ground that he had failed to readjust to society, and therefore held that his complaint did not make out a substantive due process violation under *Merritt*. *Id.* at 69-70. Finally, the district court dismissed Hurd's procedural due process claim on the ground that he lacked any protected liberty interest—even after the date on which his original sentence of imprisonment, had it been served continuously, would have expired—"because, unlike a parolee, a mistakenly released prisoner does not have a 'legitimate claim of entitlement' to freedom." *Id.* at 71 (quoting *Henderson v. Simms*, 223 F.3d 267, 274 (4th Cir. 2000)) (alterations omitted); *see also Jenkins v. Currier*, 514 F.3d 1030, 1035 (10th Cir. 2008) ("Appellant had no due process right to a hearing when he was taken back into custody to complete his previously imposed sentence.").

## II. Discussion

### A. Standard of Review

We review *de novo* the district court's grant of the government's Rule 12(b)(6) motion to dismiss. *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1128 (D.C. Cir. 2015). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim crosses from conceivable to plausible when it contains factual allegations that, if proved, would 'allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Banneker Ventures*, 798 F.3d at 1129 (alteration omitted) (quoting *Iqbal*, 556 U.S. at 678). The court must "accept all the well-pleaded factual allegations of the complaint as true and draw all reasonable inferences from those allegations in the plaintiff's favor." *Id.* "In determining whether a complaint fails to state a claim, [the court] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). If the district court considers other facts, it must convert the motion to dismiss into a motion for summary judgment and "provide the parties with notice and an opportunity to present evidence in support of their respective positions." *Kim v. United States*, 632 F.3d 713, 719 (D.C. Cir. 2011); *see* Fed. R. Civ. P. 12(d).

### B. Claim and Issue Preclusion

The district court held that Hurd's substantive due process claim was precluded by the July 2012 decision of the D.C.

Superior Court, but we hold that neither claim nor issue preclusion applies.

Claim preclusion bars a party from re-litigating a claim that was or should have been asserted in a prior action. *See Nat. Res. Defense Council v. EPA*, 513 F.3d 257, 260 (D.C. Cir. 2008). Issue preclusion makes "the determination of a question directly involved in one action . . . conclusive as to that question in a second suit." *B & B Hardware, Inc. v. Harris Indus., Inc.*, 135 S. Ct. 1293, 1302 (2015). The federal full faith and credit statute requires federal courts to give a D.C. court's decision "the same full faith and credit" as a D.C. court would. 28 U.S.C. § 1738; *see Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985).

As a preliminary matter, it bears mention that Hurd's habeas petition was against the United States, whereas the current case is against the District of Columbia. Neither the parties nor the district court discussed whether or why preclusion could apply despite that non-mutuality. Because that question was not briefed and we find the district court's application of preclusion doctrine was erroneous on other grounds, we do not resolve it.

*1. Claim Preclusion.* The district court limited its analysis to claim preclusion, using the familiar inquiry for assessing whether a claim is precluded by a prior judgment. That inquiry "focuses on the following questions: (1) whether the claim was adjudicated finally in the first action; (2) whether the present claim is the same as the claim which was raised or which might have been raised in the prior proceeding; and (3) whether the party against whom the plea [of preclusion] is asserted was a party or in privity with a party in the prior case." *Patton v. Klein*, 746 A.2d 866, 870 (D.C. 1999) (per curiam). The district court held that the "only real question" was "whether

the Superior Court denied the habeas motion on the merits." *Hurd*, 146 F. Supp. 3d at 63. Because the Superior Court had not issued any written opinion, the district court obtained the audio recording of the Superior Court's hearing to discern that the court had ruled against Hurd on the merits of his substantive due process claim. *Id.*

On appeal, Hurd contends that his section 1983 damages claim was not the same as his habeas claim, because the damages claim was not and could not have been raised in the habeas proceeding. We agree. Preclusion is designed to limit a plaintiff to one bite at the apple, not to prevent even that single bite. It thus precludes later theories or pleas for relief arising out of the same claim only if they could have been asserted in the earlier case. As the Supreme Court has observed, "claim preclusion generally does not apply where '[t]he plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy because of the limitations on the subject matter jurisdiction of the courts.'" *Marrese*, 470 U.S. at 382 (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 26(1)(c) (1982)); *see Wilson v. Hart*, 829 A.2d 511, 514 n.4 (D.C. 2003).

Cases applying claim preclusion where a different amount of damages was available in the second action compared to the first, *see* Dissent at 4-5, can hardly support preclusion where *no* damages whatsoever were available in the first action. And it is far from clear that Hurd could have joined his damages claim with his habeas petition. *See* Dissent at 3. Generally speaking, the Supreme Court has reserved habeas for those seeking release from confinement and section 1983 for those seeking other relief, such as damages. *See Skinner v. Switzer*, 562 U.S. 521, 525 (2011); *see also Wolff v. McDonnell*, 418 U.S. 539, 554 (1974) ("[H]abeas corpus is not an appropriate or available remedy for damages claims."); *Preiser v.*

*Rodriguez*, 411 U.S. 475, 493 (1973) ("[D]amages are not available in federal habeas corpus proceedings."); *Blair-Bey v. Quick*, 151 F.3d 1036, 1041 (D.C. Cir. 1998) (assuming that damages claims "clearly cannot be heard in habeas corpus"); *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (damages not available in New York state habeas proceedings). Thus, the issue here is not whether a litigant may have two chances to obtain damages for an allegedly unlawful incarceration, but whether he is entitled to any. *See Burgos*, 14 F.3d at 790 ("[W]here a plaintiff was precluded from recovering damages in the initial action by formal jurisdictional or statutory barriers, not by plaintiff's choice, a subsequent action for damages will not normally be barred by res judicata even where it arises from the same factual circumstances as the initial action."); *see also Rhodes v. Hannigan*, 12 F.3d 989, 991 (10th Cir. 1993); *Ward v. McCaughtry*, 234 F.3d 1275 (7th Cir. 2000) (unpublished order).

*2. Issue Preclusion.* The District alternatively defends the district court's judgment on the ground that Hurd's due process claims are issue precluded. Under D.C. law, issue preclusion generally prevents parties from re-litigating issues of fact or law decided in an earlier proceeding if "(1) the issue was actually litigated and (2) determined by a valid, final judgment on the merits; (3) after a full and fair opportunity for litigation by the parties or their privies; (4) under circumstances where the determination was essential to the judgment, and not merely dictum." *Davis v. Davis*, 663 A.2d 499, 501 (D.C. 1995). According to the District, the Superior Court already determined that Hurd's re-incarceration did not give rise to a substantive due process claim.

Issue preclusion does not apply because the defense was neither raised nor decided below and therefore is forfeited. *See Taylor v. Sturgell*, 553 U.S. 880, 907 (2008) (both forms of

preclusion are affirmative defenses that must be pled and proved by the defendant); *cf. Canonsburg Gen. Hosp. v. Burwell*, 807 F.3d 295, 302 (D.C. Cir. 2015) ("[A]n agency's failure to raise issue preclusion in its answer in federal court may constitute waiver.") (emphasis omitted).  In any event, even if the matter were not forfeited, issue preclusion cannot equitably apply here, where the Superior Court judge, in ruling from the bench, refused to consider documents Hurd's lawyer proffered or to provide an evidentiary hearing, and where Hurd was released and the appeal dismissed as moot before the D.C. Court of Appeals reached any judgment on the merits of his petition.  It has been "the general view of courts and commentators that among the most critical guarantees of fairness in applying collateral estoppel," a.k.a. issue preclusion, "is the guarantee that the party to be estopped had not only a full and fair opportunity but an adequate incentive to litigate 'to the hilt' the issues in question." *Haring v. Prosise*, 462 U.S. 306, 311 (1983).  Consistent with that "to the hilt" proviso, issue preclusion does not apply if "[t]he party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action." RESTATEMENT (SECOND) OF JUDGMENTS § 28(1); *see Davis*, 663 A.2d at 503; *Ali Baba Co. v. Wilco, Inc.*, 489 A.2d 418, 425 n.17 (D.C. 1984).  The Restatement's commentary is explicit that, when the earlier "controversy has become moot" on appeal, the unreviewed lower court judgment cannot have preclusive effect.  RESTATEMENT (SECOND) OF JUDGMENTS § 28 cmt. a.  That mooted-appeal exception, embraced by D.C. law, applies here.  We decline to treat the mooted-on-appeal Superior Court decision as dispositive of common issues also at stake in Hurd's damages case.

The District appears to concede that the mooted-appeal exception to issue preclusion would normally apply here, but argues that we should nevertheless treat the Superior Court

judgment as preclusive because Hurd did not specifically ask the D.C. Court of Appeals to vacate the Superior Court's decision.  For that point, the District relies on *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950).  In *Munsingwear*, the government argued—as Hurd does here—that issue preclusion did not apply because the claim for injunctive relief became moot before the government had a chance to overturn it on appeal. *Id.* at 39.  In rejecting that argument, the Court cited its "established practice," consistent with "the duty of the appellate court," to "reverse or vacate the judgment below" when a case became moot while on appeal. *Id.* at 39-40.  This "clears the path for future relitigation of the issues between the parties and eliminates a judgment, review of which was prevented through happenstance." *Id.* at 39-40.  Here, because, the D.C. Court of Appeals did not vacate the Superior Court's order but merely dismissed the appeal as moot, the District argues that the Superior Court decision is preclusive.

For two reasons, we disagree with the District's argument that *Munsingwear* overrides the mootness exception to issue preclusion.  First, the D.C. courts have not followed *Munsingwear* to hold the mooted-appeal exception inapplicable merely because a lower court's judgment was not vacated.  We recognize that the D.C. courts have cited *Munsingwear* regarding courts' *power* to vacate opinions when the controversies that spawned them became moot. *See, e.g.*, *Lewis v. Hotel and Rest. Emps. Union*, 727 A.2d 297, 299-300 (D.C. 1999) (despite rule disfavoring vacatur when sought by parties who caused mootness by voluntary action, vacatur was appropriate at government's behest where new legislation mooted claims); *Wheeler v. Goulart*, 623 A.2d 1177, 1177 (D.C. 1993); *Howell v. United States*, 455 A.2d 1371, 1372 n.1 (D.C. 1983) (en banc).  But the District has pointed to no case, nor are we aware of any, in which a D.C. court held that a party's failure to seek vacatur defeated the mootness exception

to issue preclusion. *See* RESTATEMENT (SECOND) OF JUDGMENTS § 28 Reporter's Note (cautioning that the *Munsingwear* rule "does not appear to have gained adherence in the courts of the states").

Second, even if the D.C. courts embraced that aspect of *Munsingwear*, we would not apply it here. The *Munsingwear* rule involves "equitable" considerations and it gives way when "fairness" requires. *See U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 25 (1994). In *Munsingwear*, the government had "acquiesced in the dismissal" yet failed to seek vacatur. 340 U.S. at 40. The Court held that, "having slept on its rights," the government could not avoid the preclusive effect of the district court judgment. *Id.* at 41. Hurd, in contrast, never acquiesced in the dismissal of the habeas petition asserting his due process claims, and he did not cause his own appeal to be mooted by voluntary action. *See Lewis*, 727 A.2d at 299-300 (noting that the "principal factor to be considered" in whether to vacate mooted decision is "whether the party seeking relief from the judgment below caused the mootness by voluntary action"); *U.S. Bancorp Mortg.*, 513 U.S. at 24 (same). Rather, Hurd urged the D.C. Court of Appeals to decide his petition on its merits precisely to remove any bar against a subsequent action for damages. In rejecting Hurd's concerns about the potential adverse effects of the Superior Court's order, the D.C. Court of Appeals cited the Supreme Court's opinion in *Spencer v. Kemna*, 523 U.S. 1, 17 (1993), and Justice Souter's concurrence, *id.* at 20-21, which held that the prospect of a future damages action under section 1983 could not sustain a habeas claim otherwise mooted by the prisoner's release. *See Hurd v. United States*, No. 12-CO-1364, slip op. at 2 (D.C. Ct. App. Dec. 18, 2013). In the cited passages, the *Spencer* Court noted that it was "not certain . . . that a § 1983 damages claim would be foreclosed" by the denial of habeas, *id.* at 17, and the four concurring justices elaborated

that "a former prisoner, no longer 'in custody,' may bring a § 1983 action . . . without being bound to satisfy a favorable-termination requirement that it would be impossible as a matter of law for him to satisfy." *Id.* at 21.

We see no reason to treat Hurd's due process claims as barred simply because he failed to take the added step of filing a motion for vacatur—particularly where the point was neither pressed nor passed on below. D.C. law does not appear to require it, and the D.C. Court of Appeals' dismissal of Hurd's appeal is reasonably read as so confirming. We therefore hold that the Superior Court's unreviewed denial of Hurd's habeas petition does not preclude him from asserting his section 1983 due process claims against the District of Columbia.

## C.  Sufficiency of the Complaint

The district court also held that Hurd's complaint failed on the merits to state a claim on which relief could be granted. Hurd claimed that his re-incarceration violated his rights to procedural and substantive due process.[3] We address the due process arguments in turn below.

---

[3] The District contends that Hurd's complaint did not include a separate claim for damages for an alleged violation of procedural due process. But Hurd claimed that he was "deprived of" both procedural and substantive due process, *see* First Am. Compl. ¶¶ 65-66, and he asserted a right "to notice and a hearing," *id.* at ¶ 62. He sought "damages for violation of his constitutional right to liberty" as well as "[s]uch other and further relief as the Court may deem just and proper." *Id.* at ¶ 74.

### 1.   Procedural Due Process

It is "undisputed that the District failed to provide Hurd with any prior notice or hearing," and therefore "the only question is whether he had a protected liberty interest" that would entitle him to some procedure before re-incarceration. *Hurd*, 146 F. Supp. 3d at 71.  The district court concluded that Hurd lacked a "protected liberty interest in his continued freedom."   *Id.* at 71-72.   Unlike a parolee, who is constitutionally entitled to a revocation hearing, *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972), the district court concluded that "a mistakenly released prisoner does not have a legitimate claim of entitlement to freedom."  146 F. Supp. 3d at 71.  This categorical proposition cannot be squared with established law. A prisoner who is released from prison early does in certain circumstances have a protected liberty interest entitling him to some form of process before re-incarceration, and the facts as plausibly pleaded here show such an interest.

The Due Process Clause may itself confer a procedurally protected liberty interest on someone living openly in society for years after what, unbeknownst to him, was his premature release from prison.  The Due Process Clause protects liberty, U.S. Const. amend. V, XIV, and "freedom from bodily restraint" is at the very core of that protected interest.  *Bd. of Regents v. Roth*, 408 U.S. 564, 572 (1972); *see also Washington v. Glucksberg*, 521 U.S. 702, 719 (1997) (referring to "the absence of physical restraint" as the uncontested baseline liberty the Due Process Clause protects).  The freedom of a person to conduct his life physically unconfined by the government is among the most fundamental of constitutional liberty interests.  The Supreme Court has repeatedly held that in at least some circumstances, a person who is in fact free of physical confinement—even if that freedom is lawfully revocable—has a liberty interest that entitles him to

constitutional due process before he is re-incarcerated. *See Young v. Harper*, 520 U.S. 143, 152 (1997) (pre-parole conditional supervision); *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973) (probation); *Morrissey*, 408 U.S. at 482 (parole).

In *Morrissey*, for instance, the Court recognized that a person who is out of prison under criminal justice supervision, even though subject to re-incarceration at any time for noncompliance with parole conditions, has a personal liberty interest sufficient to trigger procedural due process protection before his parole may be revoked. 408 U.S. at 482-86. In descriptive terms equally applicable to Hurd's circumstances between his 2007 release and 2011 re-incarceration, *Morrissey* noted that the "liberty of a parolee enables him to do a wide range of things open to persons who have never been convicted of any crime." *Id.* at 482. Once the Parole Commission released him into the community, Hurd, like a parolee, was able to be—and was— "gainfully employed and [] free to be with family and friends and to form the other enduring attachments of normal life." *Id.* For released prisoners and parolees alike, "[s]ociety has a stake in whatever may be the chance of restoring [the individual] to normal and useful life within the law," so society also "has an interest in not having parole revoked"—nor re-incarceration imposed—"because of erroneous information." *Id.* at 484. *Morrissey* therefore held that re-incarcerating a parolee "calls for some orderly process, however informal." *Id.* at 482.

The district court distinguished *Morrissey* on the ground that the parole at issue there "is served in lieu of prison time," while supervised release, which Hurd successfully completed between 2007 and 2010, "is served only after the prison term is ended." 146 F. Supp. 3d at 71. The distinction between parole and supervised release is not dispositive of Hurd's procedural due process claim. Indeed, the character of

supervised release as a follow-on to a sentence of imprisonment, together with Hurd's fulfillment of his entire term of supervised release, reinforces the reasonableness of his expectation that he had completed his sentence, and strengthens his liberty interest. When a person lives in society at large for years, goes through a transition that, by all appearances, marks the formal end of the last stage of his sentence, and only then faces re-incarceration on the ground that he was prematurely released, the prospect of re-incarceration has implications both for him and the other individuals in his life as substantial as those of the parolee in *Morrissey*.

Hurd alleges facts that support a liberty interest crystallized sufficiently by the close of the period of supervision to entitle him to some kind of process before re-incarceration. As Hurd was aware, his original sentence did not impose a mandatory minimum. Joint App. 47. The Federal Bureau of Prisons released him from a 42-month prison sentence after 13 months. As shown by his submission to and successful completion of three years of supervised release, Hurd reasonably thought the release was deliberate and lawful. Indeed, if he had believed it was an error that might be discovered and corrected, it is hard to see why he would have remained in the District of Columbia, successfully (though apparently not flawlessly) serving out his prescribed term of supervised release.

The government documented the terms, both temporal and otherwise, of Hurd's supervision. His Certificate of Supervised Release recited July 18, 2007 as the date of his release from prison, enumerated the conditions of supervision, and, on behalf of the Parole Commission, stated that Hurd was "to be released to supervised release for a term of 36 months upon release from imprisonment." Joint App. 85. Hurd complied by

reporting to CSOSA officers regularly for three years, submitting urine samples for drug testing, and training for and obtaining a well-paid job. During 2007-2010, which all parties treated as his post-incarceration period of supervised release, the Parole Commission monitored Hurd and at no point expressed any governmental interest in revoking his release and re-incarcerating him. By regulation, once Hurd's term of supervision was complete, it was no longer subject to revocation. 28 C.F.R. § 2.211(d). Hurd's many communications and interactions with the government reinforced his reasonable understanding that he was continuing to serve his sentence and that he was making progress toward unconditional release from criminal justice supervision.

Additional features of this case underscore the value of pre-deprivation process before re-incarcerating someone in Hurd's situation. As the district court acknowledged, the D.C. Department of Corrections unilaterally re-incarcerated Hurd without a warrant or a detainer despite the fact that the authority to detain him was statutorily committed to the Federal Bureau of Prisons. *Hurd*, 146 F. Supp. 3d at 68; *see* D.C. Code § 24-201.26 (prisoners convicted in the District of Columbia "shall be committed, for their terms of imprisonment … to the custody of the Attorney General of the United States or his authorized representative"). If Hurd had received notice and a hearing before his re-incarceration, he might have raised an *ultra vires* challenge to the District's authority to detain him. *See* 146 F. Supp. 3d at 68-69. A timely hearing could also have allowed Hurd to present his substantive claims against re-incarceration. It is difficult to imagine how the highly fact-specific nature of the analysis the district court and the parties deemed applicable, hinging substantially on whether Hurd had successfully "turned his life around," *id.* at 70, could have been fairly assessed without Hurd having had any chance to present his own case.

## 2. Substantive Due Process

The parties and the district court analyzed Hurd's substantive due process claim challenging his reimprisonment under *Merritt*, 478 F. Supp. 804, which the court identified as "one of the early, leading cases finding that a released prisoner could not be re-incarcerated." 146 F. Supp. 3d at 65. *Merritt* held that it violated "fundamental principles of liberty and justice" to re-incarcerate an individual who had been discharged from state prison and lived openly for three years before the government realized that it should have moved him to federal prison rather than discharging him upon completion of his state sentence. The *Merritt* court started from the premise that "[a] convicted person will not be excused from serving his sentence merely because someone in a ministerial capacity makes a mistake" by releasing him early. 478 F. Supp. at 807. "Several additional factors must be present" to make out a violation of substantive due process: "the result must not be attributable to the defendant himself; the action of the authorities must amount to more than simple neglect; and the situation brought about by defendant's release and his re-incarceration must be unequivocally inconsistent with fundamental principles of liberty and justice." *Id.*

On Merritt's federal habeas petition, the court found that "[r]esponsibility for the defendant's release from prison and his subsequent at-large status rest[ed] entirely with the governmental authorities." *Id.* The court considered the lack of fault on Merritt's part, the responsibility of the government for the error, and the "actual consequences" of an order requiring him to serve his federal sentence. *Id.* at 808. *Merritt* concluded that "[a]n order requiring service of defendant's sentence now would needlessly jeopardize his long-term adjustment to society, disrupt both his family and his family life, and destroy his economic base, all for no purpose other

than to secure blind obedience to the 1973 sentence as it was then imposed." *Id.*

Here, the district court restated the relevant considerations under *Merritt* as "(1) the length of mistaken release; (2) the government's level of culpability; (3) the prisoner's knowledge of, or contribution to, the mistake; and (4) the prejudice caused by re-incarceration, *i.e.*, how well the prisoner has readjusted to society." 146 F. Supp. 3d at 66. The district court described Hurd's case as closely analogous to or perhaps stronger than *Merritt* in most respects; the claim's dispositive weakness, in the district court's view, was that Hurd had not reintegrated into society as successfully as had Merritt. Several factors were neutral or favored Hurd: The district court thought the length of Hurd's time at large could support relief, *id.* at 67; that federal authorities, not the District of Columbia or Hurd, were at fault for the release, *id.*; and that the "questionable authority" of the District as opposed to the federal government to take Hurd back into custody was "concerning," *id.* at 68. The court noted that "the District itself seems to have acknowledged its lack of authority"; the court thus thought it "arguable that Hurd's imprisonment was *ultra vires*"—a factor that "does weigh in plaintiff's favor in the due process analysis." *Id.* at 68-69. The court also held, for the purposes of the motion to dismiss, that "there is no indication that Hurd was aware of the mistake until he was re-incarcerated." *Id.* at 69.

The court deemed decisive, however, that Hurd had not "successfully turned his life around" during his supervised release. *Id.* at 70. In its view, re-incarceration "is really only fundamentally unfair" where the prisoner has become "a success story." *Id.* at 69. Taking judicial notice of exhibits the District filed with its motion to dismiss, the court recognized that Hurd "successfully completed his three-year term of

supervision, worked as a sheet metal journeyman, completed an anger management course, and re-established his ties to his wife and children." *Id.* at 70. The court decided, however, that his arrests and drug-testing records "negate[d] any argument that [he] successfully turned his life around." *Id.* The court reached that conclusion despite acknowledging that Hurd's only conviction after his 2007 release was for marijuana possession (and that was after his supervised release had ended); his other arrests resulted either in acquittals or dismissals; and the Parole Commission had decided not to revoke his supervised release, but determined after three years that he had successfully completed it. *Id.* at 60.

For purposes of this appeal, we merely assume, in accord with the parties' and district court's approach in this case, that *Merritt* applies. Treating as relevant "how well the [ex-] prisoner has readjusted to society," *id.* at 66, we hold that abbreviation of procedure in the district court requires a remand. The district court relied on material beyond the pleadings to grant the motion to dismiss without permitting discovery and summary judgment briefing on the substantive due process claim and, in particular, on the element the district court deemed determinative and on which Hurd's own evidence would necessarily be highly relevant: whether he had "turned his life around." *Id.* at 70. In concluding that Hurd was not entitled to relief under *Merritt*, the court looked beyond the allegations of the complaint to evidence the government submitted. The court noted that after his release Hurd, an acknowledged addict, had repeatedly tested positive for drugs and was arrested four times, once resulting in a conviction. *Id.* Those facts were neither alleged in Hurd's complaint nor included in documents that the complaint incorporated by reference. Instead, the District of Columbia attached documentary evidence of Hurd's drug tests and arrest records to its motion to dismiss. When a moving party introduces

"matters outside the pleadings" in support of a motion to dismiss, Rule 12(d) requires the district court either to ignore that evidence in deciding the motion under Rule 12(b)(6), or to convert the motion into one for summary judgment. The district court did neither.

The District of Columbia argues that the court appropriately considered the District's documentary evidence because it was filed in Hurd's Superior Court habeas case and was subject to judicial notice. A federal court may take judicial notice of "a fact that is not subject to reasonable dispute" if it either "is generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). This court has for various purposes taken judicial notice of court records from other cases. For example, in *Jankovic v. International Crisis Group*, 494 F.3d 1080 (D.C. Cir. 2007), a defamation case, we drew on a filing in an unrelated case as a record of what was said. *Id.* at 1088. But we did not, and could not, rely on it for the truth of the matter asserted. *Id.*; *see* 21B Fed. Prac. & Proc. Evid. § 5106.4 (2d ed.) ("[A] court cannot take judicial notice of the truth of a document simply because someone put it in the court's files.").

That common-sense limitation on judicial notice is particularly apt in a case where the court purports to treat a noticed fact as preclusive. "If it were permissible for a court to take judicial notice of a fact merely because it has been found to be true in some other action, the doctrine of collateral estoppel would be superfluous." *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994). The District argues that judicial notice was appropriate here because Hurd did not dispute the authenticity of the documents that the district court considered. But acquiescing to the authenticity of documents introduced in an earlier case is a far cry from agreeing that

those documents present a full or fair picture of a matter a party has a right to dispute in a later case. That is especially true here, where the factual issues include the highly contextual, case-specific question of whether Hurd's post-release conduct rendered him ineligible for relief.

In order to go beyond testing the adequacy of the allegations of the complaint, a district court must follow the procedures for converting a motion to dismiss into one for summary judgment. The Federal Rules prescribe the process for doing so: The court must give the parties notice of the court's intention to convert the motion and a reasonable opportunity to discover and present relevant evidence. Fed. R. Civ. P. 12(d). The text of Rule 12(d) specifies that, "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *See also Kim*, 632 F.3d at 719; *3M Co. v. Boulter*, 842 F. Supp. 2d 85, 96-97 (D.D.C. 2012). As a leading treatise explains, "[t]he court, *sua sponte*, may convert a motion under Rule 12(b)(6) into one for summary judgment, but the conversion by the district judge should be exercised with great caution and attention to the parties' procedural rights." 5C FED. PRAC. & PROC. § 1366, *Conversion of a Rule 12(b)(6) Motion Into a Summary Judgment Motion* (3d ed.). The district court has discretion whether to consider affidavits or other factual matter outside the pleadings but, as Rule 12(d)'s use of the obligatory "must" makes plain, a court that decides to consider extra-pleading material is required to convert the motion to dismiss into one for summary judgment, with attendant procedural protections. In such a case, the motion is decided under Rule 56's standard, keyed to legal and evidentiary sufficiency, *see Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), rather than the

Rule 12(b)(6) standard of plausible pleading, *see Iqbal*, 556 U.S. 662.

The district court did not take the requisite steps for looking beyond the complaint to consider the material the District of Columbia proffered. To do so, it would have had to notify Hurd of its intention to consider factual submissions and give him the opportunity to discover and offer evidence of his own—whether to rebut any facts or negative inferences the district court might draw from the government's exhibits or to provide facts and context in his own support. *See* Fed. R. Civ P. 12(d), 56. By casting the issue as one of the district court's authority to take judicial notice at the motion-to-dismiss stage, the District sought to have documents supportive of its view of potentially disputed issues of fact considered as if they were part of the plaintiff's own allegations. But a movant may not, consistent with the Federal Rules of Civil Procedure, support a 12(b)(6) motion by pointing to the content of evidence in other cases to rebut facts adequately stated in an opposing party's pleading. The reasoning set forth in the district court's opinion therefore fails to support dismissal, and the case must be remanded for further proceedings.

We close by emphasizing again that this court has not yet had occasion to set forth a framework for analyzing a prematurely released prisoner's re-incarceration, and we merely assume without deciding here that *Merritt* applies. This is not the type of due process issue that the courts have "reduced to detailed and nearly mechanical rules," but rather one in which "the precepts are very general, and everything turns on the circumstances." *DeWitt v. Ventetuolo*, 6 F.3d 32, 32 (1st Cir. 1993). Other jurisdictions have looked to *Merritt* for guidance. *See Lima-Marin v. Raemisch*, No. 16-cv-31216, slip op. at 72-75, 103-105 (Colo. D. Ct., Arapahoe County, May 16, 2017) (placing *Merritt* in the context of the

development of state and federal law governing constitutional challenges to re-incarceration after early release); *United States v. Martinez*, 837 F.2d 861, 864 (9th Cir. 1988) (collecting cases). But since *Merritt* was decided, the Supreme Court has emphasized that "only the most egregious official conduct"— that which "shocks the conscience"—"can be said to be arbitrary in the constitutional sense," *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998), and some courts have relied on this language to narrow if not eliminate the possibility of relief for persons re-incarcerated after premature release, *see Hawkins v. Freeman*, 195 F.3d 732, 742 (4th Cir. 1999) (en banc) (suggesting that the fact that "erroneous release … is a surprisingly widespread and recurring phenomenon" weighs against a finding of arbitrariness); *but see United States v. Grant*, No. 16-4258, 2017 WL 2871372, at *3 (4th Cir. July 6, 2017) (assuming "that in some circumstances, federal common law offers prisoners the possibility of credit for time erroneously spent at liberty"). Still, *Lewis* recognized that when officials have "the luxury" of "time to make unhurried judgments," and "such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." 523 U.S. at 854. If this case were to return to this court, we trust that the parties would focus on whether *Merritt* should become the law of this circuit, factoring in the *Lewis* "shocks the conscience" threshold while accounting for the arguably non-exigent circumstances involved in deciding whether or not a prisoner who was released early should be re-incarcerated years later.

## Conclusion

For the foregoing reasons, we vacate the district court's judgment and remand for further proceedings consistent with this opinion.

*So ordered.*

RANDOLPH, *Senior Circuit Judge*, dissenting: Michael D. Hurd, Jr.'s complaint for damages, brought under 42 U.S.C. § 1983, alleged that the District of Columbia deprived him of due process in violation of the Fifth Amendment to the Constitution when he was reimprisoned after District authorities discovered that he had been prematurely released from prison. Hurd brought this action after he finished serving the balance of his original sentence.

One of the problems with Hurd's § 1983 complaint, and the only one I need address, is that before he filed this action in federal court he brought the same claims of procedural and substantive due process in a habeas corpus petition in the District of Columbia Superior Court, and lost.

Here, the district court ruled that the Superior Court's habeas decision precluded Hurd's substantive due process claim,[1] but not his procedural claim that he was entitled to a hearing before being reimprisoned. Procedural claims, the district court reasoned, are "largely irrelevant" to habeas petitions, so Hurd "could not have raised" such a claim. *Hurd v. D.C.*, 146 F. Supp. 3d 57, 63 n.3 (D.D.C. 2015). The source of the district court's theory is unclear. In D.C. courts and elsewhere, procedural due process affects the legality of detentions. *See, e.g.*, *Wells v. Golden*, 785 A.2d 641, 643 (D.C. 2001); *Hill v. D.C. Bd. of Parole*, 766 A.2d 497, 498-500 (D.C. 2000). That is why Hurd raised the procedural issue in the Superior Court.

---

[1] The district court properly reviewed the habeas decision in deciding to dismiss Hurd's § 1983 action. *See, e.g.*, *Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005); *Stanton v. D.C. Court of Appeals*, 127 F.3d 72, 76-77 (D.C. Cir. 1997). *See also In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 16-20 (1st Cir. 2003).

On appeal, Hurd argues that because the District of Columbia Court of Appeals dismissed Hurd's habeas appeal as moot, the Superior Court's decision lacks preclusive effect. But Hurd never asked the D.C. Court of Appeals to vacate the judgment denying his habeas petition and the Court of Appeals never did so. As a result, the habeas decision retained its preclusive force. That is the holding of *United States v. Munsingwear, Inc.*, 340 U.S. 36, 39-41 (1950). District of Columbia law controls the preclusive effect of the habeas judgment against Hurd, *see Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 80-81 (1983), and the District of Columbia's highest appellate court has endorsed the law as set forth in *Munsingwear*. *See, e.g.*, *Lewis v. Hotel & Rest. Employees Union, Local 25, AFL CIO*, 727 A.2d 297, 299-302 (D.C. 1999); *Wheeler v. Goulart*, 623 A.2d 1177, 1177 (D.C. 1993) (per curiam); *Smith v. Town Ctr. Mgmt. Corp.*, 329 A.2d 779, 780 (D.C. 1974).[2]

The majority rejects claim preclusion on different grounds. It first states that Hurd could not have raised his damages claim

---

[2] The majority says that "D.C. courts have cited *Munsingwear* regarding courts' *power* to vacate opinions when the controversies that spawned them became moot," but argues that no D.C. court – at least in cases involving issue preclusion – has enforced the *Munsingwear* vacatur requirement. Maj. Op. 14-15. When the D.C. Court of Appeals has discussed *Munsingwear*, however, it has noted the consequences of failing to vacate the decision under review. The decision would "remain in force unreviewed" and would permit "a judgment, unreviewable because of mootness," to "spawn[] . . . legal consequences." *Lewis*, 727 A.2d at 302 (internal quotation marks omitted). The available evidence thus suggests that given the opportunity, and in light of Hurd's failure to request vacatur of the habeas judgment, the D.C. Court of Appeals would enforce *Munsingwear* and find Hurd's claims precluded. "If there is hardship in this case, it was preventable." *Munsingwear*, 340 U.S. at 39.

in the habeas petition. That is accurate. But there is no reason why he could not have joined the § 1983 damages claim with the habeas petition. The majority relies on Restatement (Second) of Judgments § 26(1)(c) (1982) (stating claim preclusion inapplicable when the "plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy because of the limitations on the subject matter jurisdiction of the courts"), but that Restatement provision is inapposite.[3] Hurd's damages claim would have likely been contingent on him prevailing in his habeas petition, *Heck v. Humphrey*, 512 U.S. 477, 489 (1994), but D.C. Superior Court Rule of Civil Procedure 18(b) allows the joinder of such claims. The federal rules allow the same. *See* FED. R. CIV. P. 18(b). *See also Wolff v. McDonnell*, 418 U.S. 539, 554 (1974). And the Superior Court would have had jurisdiction over the separate § 1983 claim. *See Haywood v. Drown*, 556 U.S. 729, 731 (2009); *Smith v. D.C.*, 882 A.2d 778, 780-81 (D.C. 2005). That the "Supreme Court has reserved habeas for those seeking release from confinement and section 1983 for those seeking other relief," Maj. Op. 11, misses the point. In light of Superior Court Rule 18(b), Hurd could have joined a § 1983 claim with his habeas claim.

Even if that were not the case, the District of Columbia's definition of "claim" for preclusion purposes does not depend on the available relief. Under D.C. law the "nature and scope of a

---

[3] Even if the Restatement provision were relevant, we must follow District of Columbia law, not the views of the Restatement drafters. *See Migra,* 465 U.S. at 80-81; *Kansas v. Nebraska*, 135 S. Ct. 1042, 1064 (2015) (Scalia, J., concurring in part and dissenting in part). That is especially so when, as here, District of Columbia courts have rejected the precise Restatement subsection on which the majority opinion relies. *See* Maj. Op. 11. *Compare Shin v. Portals Confederation Corp.*, 728 A.2d 615, 620 (D.C. 1999), *with id*. at 620 (Ruiz, J., dissenting). Dicta from *Wilson v. Hart*, 829 A.2d 511, 514 n.4 (D.C. 2003), does not change the analysis. *See* Maj. Op. 11.

'cause of action' is determined by the factual nucleus, not the theory on which a plaintiff relies." *Faulkner v. Gov't Employees Ins. Co.*, 618 A.2d 181, 183 (D.C. 1992). Here, Hurd's habeas petition and his § 1983 action arose from the same factual nucleus and thus constituted the same "claim" under D.C. preclusion law.

The majority's contrary view – that in order to have preclusive effect, the available relief in the first proceeding must meet or exceed the available relief in the second – finds no support in D.C. law. D.C. courts have repeatedly held the opposite. In *Osei-Kuffnor v. Argana*, 618 A.2d 712 (D.C. 1993), for instance, the D.C. Court of Appeals rejected the plaintiff's argument that res judicata did not apply when the prior action took place in a jurisdictionally-limited court. "*Res judicata* is based on the premises that the aggrieved party should be given but one opportunity to allege that wrong," the court wrote, "and where the facts that give rise to a legal action are fully litigated in one forum, there is no rationale for relitigating those facts elsewhere." *Id.* at 715 (quotation and alterations omitted). "The fact that the jurisdictional amount of the D.C. Superior Court is greater than the jurisdictional amount of the Prince Georges County District Court," the court continued, "does not demonstrate that the underlying facts and claims in the instant case have not already been adjudicated in the Maryland case." *Id.* The court therefore upheld the dismissal of the complaint on res judicata grounds. *Id.* Other decisions have reaffirmed this holding. *See Shin v. Portals Confederation Corp.*, 728 A.2d 615, 619–20 (D.C. 1999) ("This court has held that such a discrepancy in the amount of available damages is not relevant to whether *res judicata* bars a claim."); *Molovinsky v. Monterey Co-op., Inc.*, 689 A.2d 531, 533 (D.C. 1996). *See also Williams v. Ward*, 556 F.2d 1143, 1154 (2d Cir. 1977) (Friendly, J.) ("[T]he mere fact that the remedy sought in one action is different from that sought in another does not alone suffice to differentiate the underlying claims."). That the precluded party

did not choose "the first forum with limited jurisdiction" has not mattered under D.C. law. *See Shin*, 728 A.2d at 621 n.4 (Ruiz, J., dissenting).

It is true, as the majority notes, that the above cases involved actions for damages in both the first and second forums. Maj. Op. 11. But the reasoning in the decisions directly applies to this case. An "aggrieved party should be given but one opportunity to allege" a particular wrong, the court wrote in *Molovinsky*, so claim preclusion may apply even when the first forum "lacked the jurisdictional competence" to provide the relief sought in the second action. 689 A.2d at 533.

To be sure, no D.C. court has squarely held that a prior habeas decision can preclude a later § 1983 action. But no D.C. court has held the opposite. Because we must apply D.C. preclusion law, *see Migra*, 465 U.S. at 80-81*,* the relevant question is how the D.C. Court of Appeals would decide this question. In this way, the case mirrors *Gonzales v. California Department of Corrections*, 739 F.3d 1226 (9th Cir. 2014). In *Gonzales*, the court analyzed whether under California law, a prior habeas adjudication precluded the § 1983 action before the court. *Id.* at 1230-32. California state courts had not decided that precise question, but because "California's doctrine of claim preclusion does not require identity in relief sought," the Ninth Circuit unanimously held that the habeas adjudication could preclude the § 1983 action. *Id*. at 1232. So too here.[4]

---

[4] The majority states that "Hurd's habeas petition was against the United States, whereas the current case is against the District of Columbia." Maj. Op. 10. Yet the District of Columbia may have also been a party to the habeas case. The Superior Court asked the "United State's [sic] Attorney's Office and/or the District of Columbia Attorney General's Office, as respondent(s)," to file responses to the habeas petition, and the District of Columbia filed a response contesting its inclusion in the case and addressing the merits. *See*

The *Gonzales* decision is no outlier. In *Preiser v. Rodriguez*, 411 U.S. 475, 497, 500 (1973), for example, the Supreme Court's holding that habeas provided the exclusive federal remedy for the restoration of good-conduct-time credits depended in part on the prospect of state habeas decisions precluding later § 1983 actions. *See Williams*, 556 F.2d at 1153 n.4. Our court and many other courts of appeals have also recognized that federal habeas decisions may have preclusive effect in later civil rights actions. *See, e.g.*, *Monk v. Sec'y of Navy*, 793 F.2d 364, 366-67 (D.C. Cir. 1986); *Reaves v. Pennsylvania Bd. of Prob. & Parole*, 580 F. App'x 49, 53-54 (3d Cir. 2014) (per curiam); *Hawkins v. Risley*, 984 F.2d 321, 323 (9th Cir. 1993) (per curiam); *Warren v. McCall*, 709 F.2d 1183, 1183 (7th Cir. 1983); *Williams*, 556 F.2d at 1153-54 (Friendly, J.). *See also Stanton v. D.C. Court of Appeals*, 127 F.3d 72, 78 n.4 (D.C. Cir. 1997).

---

Order to Show Cause, *Hurd v. United States*, No. 05-FEL-4391 (D.C. Super. Ct. Nov. 21, 2011); Non-Party District of Columbia Department of Correction's Response to Plaintiff's Motion for Writ of Habeas Corpus at 1-3, *Hurd v. United States*, No. 05-FEL-4391 (D.C. Super. Ct. Dec. 21, 2011). The D.C. Superior Court apparently did not resolve the question whether the District of Columbia was a party.

Even if the District of Columbia was not a party, it is in privity with the United States for this action. "Traditional categories of privies" include "those whose interests are represented by a party to the action." *Patton v. Klein*, 746 A.2d 866, 870 (D.C. 1999) (per curiam) (internal quotation marks omitted). In this case, the District of Columbia stated in its habeas response that the United States represented its interests. *See* District of Columbia Habeas Response at 2. The United States was also only a party to the habeas case because of its unique role in enforcing District of Columbia law. *See, e.g.*, D.C. Code § 23-101 (prosecution responsibilities); D.C. Code § 24-131 (parole responsibilities).

These cases and others support the conclusion that Hurd's § 1983 action is precluded.[5] I would therefore affirm the judgment of the district court dismissing Hurd's § 1983 complaint.

---

[5] I express no view on whether *Heck v. Humphrey*, 512 U.S. 477 (1994), may also warrant dismissal of part or all of Hurd's claims. The parties did not brief the issue and the circuits are split. *See Cohen v. Longshore*, 621 F.3d 1311, 1315-17 (10th Cir. 2010).